Amir Shlesinger (SBN 20413)
ashlesinger@reedsmith.com
REED SMITH LLP
515 South Flower Street
Suite 4300
Los Angeles, CA 90071-1514
Telephone: +1 213 457 8000
Facsimile: +1 213 457 8080

Mark E. Bini (*pro hac vice* forthcoming)
New York Bar No. 3995156
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Tel: 212.521.5400
mbini@reedsmith.com

Attorneys for Plaintiffs

Martin J. Bishop (*pro hac vice* forthcoming)
Illinois Bar No. 6269425
Alexandra M. Lucas (*pro hac vice* forthcoming)
Illinois Bar No. 6313385
Jason T. Mayer (*pro hac vice* forthcoming)
Illinois Bar No. 6309633
Reed Smith LLP
10 S. Wacker Dr. Suite 4000
Chicago, IL 60606
Tel: 312.207.1000
mbishop@reedsmith.com
alucas@reedsmith.com
jmayer@reedsmith.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, a California corporation; BLUE CROSS OF CALIFORNIA DBA ANTHEM BLUE CROSS, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>HALOMD, LLC; ALLA LAROQUE; BRUIN NEUROPHYSIOLOGY, P.C.; iNEUROLOGY, PC; LOS ANGELES NEUROLOGICAL ASSOCIATES, PC; N EXPRESS, PC; NORTH AMERICAN NEUROLOGICAL ASSOCIATES, PC; SOUND PHYSICIANS EMERGENCY MEDICINE OF SOUTHERN CALIFORNIA, P.C.; and SOUND PHYSICIANS ANESTHESIOLOGY OF CALIFORNIA, P.C.,<br><br>Defendants. | No.: <u>25-cv-1467</u><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>VIOLATION OF RICO, 18 U.S.C. § 1962(c); VIOLATION OF RICO, 18 U.S.C. § 1962(d); FRAUDULENT MISREPRESENTATION; NEGLIGENT MISREPRESENTATION; BUSINESS ACTS OR PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *ET SEQ.;* VACATUR OF NSA ARBITRATION AWARDS; ERISA CLAIM FOR EQUITABLE RELIEF; DECLARATORY AND INJUNCTIVE RELIEF |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Plaintiffs Anthem Blue Cross Life and Health Insurance Company ("**ABCLH**") and Blue Cross of California d/b/a Anthem Blue Cross ("**ABC**") (collectively, "**Anthem**") submit this Complaint against the following groups of defendants: (1) HaloMD, LLC ("**HaloMD**") and Alla LaRoque (collectively, the "**HaloMD Defendants**"); (2) Bruin Neurophysiology, P.C., iNeurology, PC, Los Angeles Neurological Associates, PC, N Express, PC, and North American Neurological Associates, PC (collectively, the "**LaRoque Family Providers**"); and (3) Sound Physicians Emergency Medicine of Southern California, P.C. and Sound Physicians Anesthesiology of California, P.C. (collectively, the "**Sound Providers**"). The LaRoque Family Providers and the Sound Providers are collectively referred to herein as the "**Provider Defendants**" and together with the HaloMD Defendants, the "**Defendants**."

## **INTRODUCTION**

1.     Anthem brings this action for damages and to enjoin coordinated efforts by two enterprises that have systematically exploited the federal No Surprises Act's ("**NSA**") independent dispute resolution ("**IDR**") process to fraudulently extract millions of dollars from Anthem and the health plans it insures or administers.

2.     Although the two enterprises are separate, their scheme to exploit the IDR system follows the same pattern: they (1) use interstate wires to knowingly submit false and fraudulent attestations of eligibility for services and disputes that they know are plainly ineligible for the IDR process, (2) strategically initiate massive volumes of IDR disputes simultaneously against Anthem, and (3) improperly inflate payment offers that far exceed what the Provider Defendants could have received from patients or health plans in a competitive market—and in many cases, multiples above the Provider Defendants' *billed charges*.

3.     The first group of defendants, members of the "**LaRoque Family Enterprise**," consist of a web of interrelated companies directly or indirectly owned by Defendant Alla LaRoque and her husband, Scott LaRoque. Alla LaRoque is the founder

COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

and President of HaloMD, the platform that the LaRoque Family Enterprise participants use to systematically and knowingly flood the IDR process with ineligible and inflated disputes. The LaRoque Family Providers—whose services form the basis of these ineligible disputes—are connected to MPOWERHealth; Defendant Alla LaRoque sits on MPOWERHealth's board, and her husband, Scott LaRoque, is MPOWERHealth's founder and CEO.[1]

4.      The second group of defendants, referred to here as the "**Sound Physicians Enterprise**," consist of entities affiliated with Sound Physicians, a national hospitalist staffing company with a documented history of overbilling federal healthcare programs. Sound Physicians previously settled with the U.S. Department of Justice to resolve allegations under the False Claims Act that the providers systematically inflated the level of services billed to government payors. Despite that prior enforcement action, the Sound Physicians Enterprise has adopted a new—but strikingly similar—scheme to defraud, this time by abusing the NSA's IDR process. Rather than submitting legitimate out-of-network claims for eligible services, the Sound Providers, acting through and in concert with the HaloMD Defendants, have flooded the IDR system with knowingly ineligible and inflated disputes.[2]

5.      Together, the LaRoque Family and Sound Physicians Enterprises have corrupted the IDR process for financial gain. Since no later than January 2024, Defendants have initiated thousands of ineligible disputes against Anthem. Approximately **55%** of disputes on which Defendants received an IDR payment

---

[1] As alleged in this Complaint, the HaloMD Defendants and the LaRoque Family Providers knowingly and intentionally acted in concert and conspired with others who are not currently named as Defendants; namely, Scott LaRoque and MPOWERHealth, as well as other persons and entities known and unknown, being persons employed by and associated with the LaRoque Family Enterprise, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs, including the wrongful acts of wire fraud alleged herein.

[2] In addition, the HaloMD Defendants and the Sound Providers knowingly and intentionally acted in concert and conspired with others who are not currently named as Defendants; namely, Sound Physicians, as well as other persons and entities known and unknown, being persons employed by and associated with the Sound Physicians Enterprise, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs, including the wrongful acts of wire fraud alleged herein.

COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

determination against Anthem were clearly ineligible for the process. Defendants knew that these disputes were ineligible and had to deliberately lie to bypass the IDR safeguards, including by selecting false dates and uploading fictitious supporting documentation. Defendants illicitly secured several millions of dollars in improper IDR awards from these ineligible disputes, hundreds of thousands of dollars of which the Provider Defendants improperly recovered after fraudulently inflating their payment offers far above their billed charges.

6.    But Defendants' fraud did not stop at ineligible disputes. Even on the eligible IDR disputes, Defendants deliberately exploited the IDR system to extract more than what the Provider Defendants billed Anthem. Defendants actually sought and received payments for services from Anthem that were more than one million dollars greater than the Provider Defendants' inflated, non-market-based billed charges, let alone the actual cost or market value of their services.

7.    Defendants are guilty of violating the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as other federal and state laws. Anthem brings this lawsuit to end Defendants' ongoing criminal enterprises and recover resulting damages.

## THE PARTIES

### I.    Plaintiffs

8.    Plaintiff ABC is a health care service plan licensed by the California Department of Managed Health Care and governed by the requirements of the Knox-Keene Health Care Service Plan Act of 1975, Cal. Health & Safety Code §§ 1340, *et seq.* Its principal place of business is in Woodland Hills, California.

9.    Plaintiff ABCLH is an insurance company regulated by the California Department of Insurance. Its principal place of business is in Woodland Hills, California.

COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## II.    HaloMD Defendants

10.    Defendant HaloMD is a Delaware limited liability company with a business address at 5080 Spectrum Drive, Suite 1100E, in Addison, Texas.

11.    Defendant Alla LaRoque is the founder and President of HaloMD. She is a resident of Texas.

## III.    LaRoque Family Provider Defendants

12.    Defendant Bruin Neurophysiology, P.C. ("**Bruin**") is a California professional corporation that provides intraoperative neuromonitoring ("**IONM**") services, including for California residents. Bruin is has its principal place of business at 5080 Spectrum Drive, Suite 1100E, Addison, Texas, with a mailing address at 100 Front Street, Suite 280, in Conshohocken, Pennsylvania.

13.    Defendant iNeurology, PC ("**iNeurology**") is a California professional corporation that provides IONM services, including for California residents. iNeurology principal place of business is located at 218 Foothills Road, Beverly Hills, California 90210.

14.    Defendant Los Angeles Neurological Associates, PC ("**LANA**") is a California professional corporation that provides IONM services, including for California residents. LANA is located at 7320 Woodlake Avenue, Suite 215, in West Hills, California.

15.    Defendant N Express, PC ("**N Express**") is a California professional corporation that provides IONM services, including for California residents. N Express principal place of business is located at 1213 Walnut Avenue, Manhattan Beach, California 90266.

16.    Defendant North American Neurological Associates, PC ("**NANA**") is a California professional corporation that provides IONM services, including for California residents. NANA is located at 701 Palomar Airport Road, Suite 300, in Carlsbad, California.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**IV.    Sound Provider Defendants**

17.    Defendant Sound Physicians Anesthesiology of California, P.C. ("**SPAC**") is a California professional corporation with its principal place of business at 120 Brentwood Commons Way, Suite 510, in Brentwood, Tennessee. SPAC is located at 4002 Vista Way in Oceanside, California.

18.    Defendant Sound Physicians Emergency Medicine of Southern California, P.C. ("**SPEMSC**") is a California professional corporation with its principal place of business at 120 Brentwood Commons Way, Suite 510, in Brentwood, Tennessee. SPEMSC is located at 2615 Chester Avenue in Bakersfield, California.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, which gives federal district courts jurisdiction over civil RICO actions. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, including the NSA, 42 U.S.C. § 300gg-111, and the Employee Retirement Income Security Act of 1974 ("**ERISA**"), 29 U.S.C. § 1001 et seq. The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

20.    Venue is proper in this District under 28 U.S.C. § 1391 because: (i) a substantial part of the events or omissions giving rise to the claims set forth herein occurred in, and were directed toward, this District; (ii) Anthem is headquartered in this District and has suffered injury here; and (iii) one or more of the Defendants reside here.

## BACKGROUND

**I.    Anthem Administers Health Care Claims and IDR Proceedings for Members, Plan Sponsors, Government Programs, and BlueCard Plans.**

21.    Anthem offers a broad range of health care and related plans and insurance contracts and services to its plan sponsors and its members and insureds who enroll in an Anthem plan, including fully insured and self-funded employee health benefit plans. Anthem processes tens of millions of health care claims annually and is responsible for ensuring that claims are paid accurately and in accordance with plan terms. As a critical

part of that responsibility, Anthem is authorized to undertake efforts to safeguard and protect themselves, their members and insureds, and the various employer group health plans they administer from fraud, waste, and abuse—like the fraud and misrepresentations Defendants perpetrated here.

22.    Anthem administers claims and benefits for several different types of health care plans relevant to this Complaint.  First, Anthem issues and administers health plans and insurance contracts, where Anthem collects premiums and is financially responsible for any benefits paid out under the plan terms or pursuant to law. Anthem sells these products either directly to consumers, such as through the federal Health Care Exchange, or to small or large employer groups who offer coverage to their employees but do not themselves insure the loss under the plan. These products are typically subject to state regulation, such as state laws prohibiting surprise billing and mandating payment for certain out-of-network claims.

23.    Second, Anthem administers self-funded plans, typically offered by large employers to their employees. These employers self-insure the plan and are financially responsible for any payment of benefits or other losses. Because employers often lack infrastructure to provide health insurance to their consumers, these plans contract with Anthem to receive administrative services, such as provider network development, customer service, and claims pricing and adjudication. These plans often delegate authority to Anthem to administer the IDR process on behalf of the plans, and the plans typically (though not always) reimburse Anthem for any awards resulting from IDR. These plans are generally exempt from state insurance laws, including state surprise billing regulation.  Instead, the plans are subject to ERISA.

24.    Third, Anthem administers government program claims, such as through the Medicare Advantage program or Medicaid managed care. Government program claims are exempt from NSA requirements and ineligible for IDR.

25.    Fourth, pursuant to the BlueCard program, Anthem acts as a "Host Plan" to other independent Blue Cross and/or Blue Shield "Home Plans" whose members

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

obtain treatment from providers in Anthem's service area in California. As a Host Plan, Anthem manages and participates in IDR proceedings that are initiated by providers in Anthem's California service area for non-Anthem plans whose members received treatment from the initiating California provider.

26.    While Anthem administers different types of health plans and claims, providers generally know what type of health care coverage the patient has. Providers require proof of insurance at the point of service to submit claims to the health plan, and the member's health insurance card identifies the nature of the member's coverage. Anthem will also issue an explanation of benefits ("**EOB**") to the provider that may provide coverage information for the member, among other information.

## II.    Before the NSA, Out-of-Network Physicians Exploited American Consumers with Surprise Medical Bills.

27.    Health plans like Anthem contract with a network of health care providers, including hospitals and physicians, from whom their members may obtain "in-network" care. Generally, patients receive better and more affordable health care coverage when receiving treatment from these in-network providers, since they have a contract with their health plan that governs the rate for the relevant services and that prohibits the providers from billing patients above that amount. Patients can choose to obtain treatment from out-of-network providers, which have no contract with their health plan, but typically, the care from out-of-network providers is more expensive.

28.    In some situations—such as in case of a medical emergency, receiving physician services in the course of treatment at an in-network hospital, or utilizing air ambulance transport—patients have limited ability to select an in-network provider. Before the passage of the NSA in 2022, certain out-of-network providers like the Provider Defendants—especially IONM providers, emergency medicine providers, air ambulance providers, critical care providers, pathology providers, anesthesiology providers, and radiology providers—capitalized on patients' lack of meaningful choice in these situations.

29.     Prior to the enactment of the NSA, these types of out-of-network providers widely engaged in the aggressive and financially devastating practice of "surprise billing." Specifically, the providers would exploit patients' lack of choice in selecting an in-network provider and bill the patient for the difference between their "inflated," "non-market-based rates"—known as "billed charges"—and the amounts paid by health plans. H.R. Rep. No. 116-615 (2020), at 53, 57.

30.     Surprise billing was particularly rampant among IONM, emergency, and anesthesiology providers like the Provider Defendants. Surprise billing providers like the Provider Defendants held "substantial market power" and "face[d] highly inelastic demands for their services because patients lack the ability to meaningfully choose or refuse care." Thus, surprise billing providers like the Provider Defendants could "charge amounts for their services that … result[ ] in compensation far above what is needed to sustain their practice." *Id.* at 53. Because surprise billing providers like the Provider Defendants could reap massive profits by issuing surprise medical bills to patients, they had little incentive to contract with health plans like Anthem and offer more affordable health care services to American consumers.

31.     Congress labeled this a "market failure" that was having "devastating financial impacts on Americans and their ability to afford needed health care." *Id.* at 52. In an attempt to resolve these problems, Congress enacted the NSA.

## III.    The No Surprises Act Creates an IDR Process for Specific Qualified IDR Items and Services.

32.     Effective January 1, 2022, the NSA banned surprise billing for three categories of out-of-network care: (1) emergency services; (2) non-emergency services at in-network facilities; and (3) air ambulance services. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135. To be subject to the NSA and IDR, health care services must fall into one of these three categories and meet other statutory and regulatory requirements described below.

33.     When enacting the NSA, Congress also found "that any surprise billing solution must comprehensively protect consumers by 'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. No. 116-615, at 55. Thus, the NSA created a separate framework outside the judicial process for health plans and providers to resolve specific types of eligible surprise billing disputes. *See* 42 U.S.C. § 300gg-111(c). The framework consists of (1) open negotiations—a required 30-business-day period to try resolving the dispute informally; (2) an IDR process for "qualified IDR items and services" if no agreement is reached; and (3) if applicable, a binding payment determination from private parties called certified IDR entities ("**IDREs**").

34.     When a health plan receives a claim for out-of-network services subject to the NSA (*i.e.*, emergency services, services provided at an in-network facility, or air ambulance services), the health plan will make an initial payment or issue a notice of denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I). The health plan's EOB includes, among other information, a phone number and email address for providers to seek further information or initiate open negotiations. *See* 45 C.F.R. § 149.140(d)(2).

35.     If the provider is dissatisfied with the initial payment, then the provider or its designee may initiate open negotiations with the health plan by providing formal written notice to the health plan within 30 business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A). After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan over the 30-business-day open negotiations period. *See id.*

36.     If the provider initiates and exhausts the 30-day open negotiations period, and "the open negotiations … do not result in a determination of an amount of payment for [the] item or service," then the provider may initiate the IDR process. *See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i). The IDR process is only available to providers who first initiate and exhaust open negotiations with the health plan. *See*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  *id.* Providers must initiate the IDR process within four business days after the open

2  negotiations period has been exhausted. *See id.*

3    37.    The 30-day open negotiations period is a central requirement of the IDR

4  process. Indeed, Congress explained that one of the primary purposes of the NSA was

5  to ensure that health care providers, including hospitals and doctors, and payors,

6  including insurance companies and self-funded plans, are incentivized to resolve their

7  differences amongst themselves. *See* Brady Opening Statement at Full Committee

8  Markup of Health Legislation (Feb. 12, 2020), available at https://waysandmeans.

9  house.gov/2020/02/12/brady-opening-statement-at-full-committee-markup-of-health-

10  legislation-3/.

11    38.    Further, the IDR process is also only available for a "qualified IDR item

12  or service" eligible for the process. 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. §

13  149.510(a)(2)(xi), (b)(1), (b)(2). To be considered a qualified IDR item or service

14  within the scope of the IDR process, the following conditions must be met:

15    a.  The underlying services are within the NSA's scope, meaning they

16       are out-of-network emergency services, non-emergency services at

17       participating facilities, or air ambulance services, and also of a

18       coverage type subject to the NSA (*e.g.*, not government programs

19       like Medicare or Medicaid);

20    b.  A state surprise billing law (referred to as a "specified state law" in

21       the NSA) does not apply to the dispute;

22    c.  The underlying services were covered by the patient's health benefit

23       plan (*i.e.*, payment was not denied);

24    d.  The patient did not waive the NSA's balance billing protections;

25    e.  The provider initiated and exhausted open negotiations;

26    f.  The provider initiated the IDR process within 4 business days after

27       the open negotiations period was exhausted; and

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 11 –

COMPLAINT AND DEMAND FOR JURY TRIAL

g.  The provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days.

42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

39.    Relevant to state surprise billing laws, which impact eligibility for IDR, the NSA defines a specified state law as "a State law that provides for a method for determining the total amount payable under such a plan, coverage, or issuer, respectively … in the case of a participant, beneficiary, or enrollee covered under such plan or coverage and receiving such item or service from such a nonparticipating provider or nonparticipating emergency facility." 42 U.S.C. § 300gg-111(a)(3)(I); 45 C.F.R. § 149.30 (same).

40.    The Centers for Medicare & Medicaid Services ("**CMS**"), the federal agency within the Department of Health and Human Services ("**HHS**") that is primarily charged with implementing the IDR process, has issued several resources to aid interested parties in determining whether a state surprise billing law exists. *See*, *e.g.*, CAA Enforcement Letters, available at https://www.cms.gov/marketplace/about/oversight/other-insurance-protections/consolidated-appropriations-act-2021-caa; Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process (Jan. 13, 2023), available at https://www.cms.gov/files/document/caa-federal-idr-applicability-chart.pdf.

41.    California has two specified state laws (collectively referred to herein as "**California's Surprise Billings Laws**").  First, the Knox-Keene Act (California Health and Safety Code Section 1371.4 and its implementing regulations-California Code of Regulations Title 28, Section 1300.71), as applied through case law, is a specified state law that concerns emergency services. Case law and the Knox-Keene Act require reimbursement for out-of-network emergency services at the reasonable and customary value, based on statistically credible information taking into consideration (i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

COMPLAINT AND DEMAND FOR JURY TRIAL

services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case. This specified state law applies to Plaintiff ABC. Second, AB 72, codified at California Health and Safety Code sections 1371.30 and 1371.31, applies to non-emergency services by non-participating providers in participating facilities and (1) requires payment of the greater of the payor's average contracted rate or 125% of Medicare rates, and (2) provides for an independent dispute resolution process to resolve any payment disputes regarding such services. *See also* California CAA Enforcement Letter (Dec. 22, 2021), available at https://www.cms.gov/files/document/cms-letter-ca-caa-enforcement-and-dispute-resolution.pdf.     This specified state law applies to both Plaintiffs.

42.     Finally, the NSA imposes certain other requirements for services submitted to IDR in addition to the fact they are qualified IDR items or services. For example, when a party submits multiple separate services to different patients in a single dispute, they must comply with the NSA's "batching rules." These batching rules require that the services be rendered to members of the same insurer or self-funded health plan during a 30-business-day period by the same provider and for treatment of the same or similar medical condition. *See* 42 U.S.C. § 300gg-111(c)(3)(A). Further, parties are prohibited from initiating IDR disputes involving the same parties and items or services during a 90-day period following an IDR determination, also known as the "cooling off period." *See id*. at § 300gg-111(c)(5)(E)(ii).

43.     When initiating the IDR process, providers must, among other things, submit an attestation that the items and services in dispute are qualified IDR items or services within the scope of the IDR process. *See* 45 C.F.R. § 149.510(b)(2)(iii)(A)(6); *see also* Notice of IDR Initiation Form, U.S. Dep't of Labor, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

notice-of-idr-initiation.pdf. A copy of the IDR initiation form, including the attestation, is provided to the non-initiating party, the IDRE, and the Departments.[3]

## IV.    The IDR Initiation Process Notifies Parties of Ineligible Disputes.

44.     Parties must initiate the IDR process online through a federal "IDR Portal." The website for submissions is https://nsa-idr.cms.gov/paymentdisputes/s/.

45.     The online process for initiating IDR is designed to notify initiating parties of facts that render services and disputes ineligible and prevent parties from inadvertently submitting ineligible items or services.

46.     The first page of the website specifies that parties may "[u]se this form if you participated in an open negotiation period that has expired without agreement for an out-of-network total payment amount for the qualified IDR item or service."

Use this form if you participated in an open negotiation period that has expired without an agreement for an out-of-network total payment amount for the qualified IDR item or service.

You can start the Federal Independent Dispute Resolution (IDR) process within 4 business days after the end of the 30-business-day open negotiation period if a determination of the total payment for the qualified IDR item(s) or service(s), including cost-sharing, wasn't reached.

You will need to **provide information for both parties involved** in the dispute.

47.     The first page also provides a link to a list of states with specified state laws that render certain disputes ineligible for the IDR process:

Review the IDR State list to determine which states will have processes that apply to payment determinations for the items, services, and parties involved. FEHB plans are subject to the Federal IDR process unless OPM contracts with FEHB carriers to include terms that adopt state law as governing for this purpose.

48.     Before initiating the IDR process, parties must agree to certain terms and conditions. The terms and conditions include a notice that the initiating party must submit an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process."

---

[3] The "Departments" include HHS, the Department of Labor, and the Department of the Treasury.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware



**Before starting:**

You may need to provide information by uploading separate documents. The total file size limit for all uploaded documents is 500MB. Be sure your files meet this limitation.

Along with the general information you'll need to start your Federal IDR dispute process, provide:

- Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
- Dates and location of qualified IDR items or services
- Type of qualified IDR items or services such as emergency services and post-stabilization services
- Codes for corresponding service and place-of-service
- Attestation that qualified IDR items or services are within the scope of the Federal IDR process
- Your preferred certified IDR entity

49.    After agreeing to the terms and conditions, initiating parties must answer certain "Qualification Questions" through an online form. If the answers to the Qualifications Questions indicate that the dispute is not eligible for IDR, the form will provide an alert and prevent the initiating party from proceeding.

50.    For example, one of the key Qualification Questions on the federal IDR website asks when the party began the open negotiation process. That question as it appears on the website is below:

Answer the following:

*Indicates a required field

ⓘ  Need help with terms? See a glossary of insurance terms and definitions that are commonly used in this form.

* When did the open negotiation period start? ⓘ

Jun 1, 2025

The 30 business-day open negotiation period must elapse before starting the federal IDR process. (Use format Dec 31, 2024)

51.    Parties must exhaust a 30-business-day open negotiation period before either party may initiate the federal IDR process. If the initiating party enters a date that is not at least 31 days before the date of website submission, the federal IDR website will not permit the initiating party to proceed and seek payment for the service.

52.    The initiating party must also upload proof of open negotiation. To push an ineligible dispute past this step, the initiating party must upload a fictitious document to support a fabricated open negotiation start date.

53.     Further, if the IDR initiation is not within four business days of the end of the 30-day open negotiation period, the initiating party must provide a reason why they are eligible for an extension and provide supporting documentation.



54.     After successfully completing the Qualification Questions, the initiating party is asked to complete the Notice of IDR Initiation. The initiating party must provide a variety of relevant information, including the name and contact information of the health care provider, the claim number, the date of the service, the Qualifying Payment Amount ("**QPA**")—generally their median in-network rate for the same service in the same geographic area—for the qualified IDR item or services at issue, and documentation supporting these facts.

55.     At the end of this process, the submitting party must attest, via electronic signature, that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process."

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

56.    A copy of the Notice of IDR Initiation—including the initiating party's attestation that that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process"—is provided to the non-initiating party (*i.e.*, the health plan), the IDRE, and the Departments.

57.    As illustrated above, at every stage of this online process, the initiating party must make false statements to submit a dispute for services that are not eligible for IDR, or the initiation process cannot continue. As such, when a party initiates the IDR process, it has full knowledge of the requirements and limits of the IDR process.

58.    HHS administers the IDR initiation process. Any submission made through this system is a statement made to the federal government, and any attestation made as part of the submission process is also made to the federal government. False attestations to the federal government violate 18 U.S.C. § 1001.

## V.    Anthem Also Informs Providers of Ineligible Disputes, including Those Subject to California's Surprise Billing Laws.

59.    In addition to the Qualifications Questions and IDR initiation process, Anthem sends multiple communications informing providers when services are ineligible for the IDR process.

60.    For example, when providers initiate negotiations for items and services subject to California's Surprise Billing Laws, Anthem notifies the provider that the "*[c]laim is not governed by the Federal No Surprises Act*."

> ✅    Claim is not governed by the Federal No Surprises Act.

61.    And even when providers ignore Anthem's negotiations communications for items and services subject to California's Surprise Billing Laws, Anthem informs the provider or designee that the items or services are "***ineligible for IDR under the NSA because a state surprise billing law applies***."

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

> The Independent Dispute Resolution (IDR) Team has received an IDR initiation notice for the above DISP Number. After review, the claim(s) is/are out of the scope (OOS) of the Federal No Surprises Act (NSA), due to the following reason(s). Please refer to the addendum for more information.
>
> ☑ The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies. Per CMS guidelines, where a specified state law provides a method for determining the total amount payable for out-of-network items and services, providers may not engage in the federal IDR process for resolving payment disputes under the NSA.

62.     Like the Qualifications Questions and IDR initiation process, Anthem's communications of ineligibility during open negotiations and after IDR initiation ensure that providers do not mistakenly pursue the IDR process for non-qualified items or services that are outside the scope of the process.

## VI.     If Applicable, IDREs Make Payment Determinations Subject to Judicial Review When Procured by Fraud

63.     After the provider initiates the IDR process, the parties select, or HHS appoints, an IDRE. 42 U.S.C. § 300gg-111(c)(4)(F). The IDRE performs two tasks.

64.     *First*, the IDRE is required by regulation to "determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). In making the determination that the IDR process applies, the IDRE is directed to "review the information submitted in the notice of IDR initiation" with the provider's attestation of eligibility. 45 C.F.R. § 149.510(c)(1)(v). In practice, this is a cursory review by the IDRE based on incomplete information and rife with errors due to an overwhelmed system from the high volume of disputes.

65.     *Second*, if the IDRE determines the IDR process applies, then the IDRE proceeds to a payment determination. 42 U.S.C. § 300gg-111(c)(5)(A).

66.     IDR payment determinations resemble a baseball-style arbitration where the provider and health plan each submit an offer, and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B).

67.     In making its determination, the IDRE must consider the QPA—which, through a detailed calculation methodology prescribed by federal regulation, approximates the health plan's median in-network contracting rate for the services—

and several "additional circumstances," such as training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). IDREs cannot consider, among other things, the provider's charges. 42 U.S.C. § 300gg-111(c)(5)(D) (IDREs "shall not consider … the amount that would have been billed by such provider or facility …"). Congress reasoned that permitting IDREs to "consider non-market-based rates such as the providers' billed charges … may drive up consumer costs." H.R. Rep. No. 116-615, at 57.

68.    The NSA provides that IDR determinations are "binding" unless there was "a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim[.]" 42 U.S.C. § 300gg-111(c)(5)(E)(i).

69.    Parties to IDR proceedings are responsible for payment of two fees. First, both parties must pay a non-refundable administrative fee of $115 when the dispute is initiated (previously a $50 fee). This fee is be recoverable even when the IDRE determines that the dispute is not qualified for IDR, or even when the initiating party voluntarily withdraws the dispute. Second, both parties must pay an IDRE fee before the IDRE makes the payment determination. The IDRE fee is set by the specific IDRE and depends on the type of IDR submitted, but ranges from $200 to $1,173. The party whose offer is selected by the IDRE is refunded its IDRE fee, meaning it is only responsible for the $115 administrative fee. The non-prevailing party is responsible for both the administrative fee and the IDRE fee.

70.    Notably, IDREs are only compensated when a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F). They do not receive compensation when dismissing a dispute due to the ineligibility of the service. *See id.* And because IDREs are compensated on a per-dispute basis, they receive greater compensation when there are a greater total number of disputes.

71.    The NSA permits judicial review "in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9" of the Federal Arbitration Act ("**FAA**"). 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). This includes the following:

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

a. where the award was procured by corruption, fraud, or undue means;

b. where there was evident partiality or corruption in the arbitrators, or either of them;

c. where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

d. where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).

## **DEFENDANTS' FRAUDULENT BILLING SCHEMES**

72.    With the passage of the NSA, surprise billing providers could no longer exploit American consumers through surprise medical bills. But as detailed further below, through two similar but distinct RICO enterprises—the LaRoque Family Enterprise and the Sound Physicians Enterprise—Defendants found a new target to exploit for massive profits: the NSA's IDR process, and by extension, health plans like Anthem.

73.    Beginning no later than January 2024, Defendants commenced coordinated schemes to exploit the IDR process and fraudulently submit thousands of ineligible and inflated disputes to Anthem, misrepresenting their eligibility for IDR under the NSA. These disputes were not merely erroneous; they were fraudulent.

74.    The core of the criminal enterprises relies on a basic lie: that the submitted disputes met the criteria for the federal IDR process. But they did not. Approximately *55%* of the disputes submitted by Defendants—comprising thousands of disputes— were categorically ineligible for the IDR process. As a result of these ineligible disputes,

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Defendants have fraudulently secured improper IDR payments totaling several millions of dollars.

75.     As explained above, IDR is only available for specific categories of disputes, subject to strict statutory and regulatory criteria. However, Defendants submit false attestations through the IDR portal, claiming eligibility for disputes involving: (1) services and disputes governed by a specified state law; (2) Medicaid or Medicare-governed services for which the NSA does not apply; (3) services not covered by the patient's plan; (4) disputes for which Defendants failed to initiate or pursue open negotiations; and (5) disputes already resolved or barred by timing rules.

76.     How have the Defendants pulled off these brazen fraud schemes? By exploiting the scale and automation of Artificial Intelligence. Promoting their use of AI in IDR submissions, the HaloMD Defendants, on behalf of and in coordination with the Provider Defendants, have flooded the IDR system with disputes at an industrial scale, deliberately overwhelming IDR safeguards and enabling payment on their fraudulent disputes.

77.     Defendants' continuous and ongoing schemes to exploit the IDR process involve three related tactics. ***First***, using interstate wires, Defendants make repeated false representations and attestations of eligibility to Anthem, the IDREs, and the Departments. ***Second***, Defendants strategically submit massive numbers of open negotiations and IDR initiations—most of which are ineligible for IDR—in an attempt to overwhelm the ability of health plans like Anthem to contest claims, confuse and swamp IDREs, and manipulate the IDR process. ***Third***, Defendants capitalize on flaws in the IDR process by submitting outrageous payment offers that they could never receive on the open market, including many that exceed the Provider Defendants' billed charges. *See* H.R. Rep. No. 116-615, at 53, 57 (noting that billed charges should not be considered in the IDR process because they are "inflated," arbitrary, and "non-market-based" figures).

78.   Through this step-by-step campaign of deception, Defendants intentionally turned the NSA's IDR process into a vehicle for their fraud scheme.

79.   This multi-step process is depicted visually in the diagram below:



**I.    Defendants Knowingly Make False Attestations of Eligibility to Initiate the IDR Process**

80.   When initiating ineligible disputes against Anthem through the IDR process, Defendants make repeated false attestations and representations that the items or services in dispute are "qualified item(s) and/or service(s) within the scope of the Federal IDR process" when, in fact, they are not. 45 C.F.R. § 149.510(b)(2)(iii)(A)(6); *see also* Notice of IDR Initiation Form, U.S. DEP'T OF LABOR, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf. Defendants make these false attestations and representations to Anthem, the IDRE, and the Departments.

81.   The items and services that Defendants falsely attest are "qualified item(s) and service(s) within the scope of the Federal IDR process" are clearly ineligible, and Defendants know that they are ineligible when making their false attestations.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

82.    As noted above, the online process for initiating IDR is designed to notify initiating parties of facts that render services and disputes ineligible and prevent parties from inadvertently submitting ineligible items or services. Initiating parties must identify, among other things, the specific date that they initiated open negotiations, the type of health plan coverage for the patient who received the services, and an affirmative attestation that the "item(s) and service(s) at issue are qualified items and/or service(s) within the scope of the Federal IDR process." ***At every stage of the initiation process***, Defendants must make ***affirmative false statements*** to proceed with the dispute or the process cannot continue for these plainly ineligible services.

83.    In addition, Anthem often directly notifies the HaloMD Defendants and the Provider Defendants that the items or services at issue in their IDR initiation are ineligible. These notifications inform Defendants that their submissions violate the NSA's eligibility requirements. Yet despite receiving this information, Defendants routinely proceed with their IDR disputes anyway—demonstrating not only their knowledge of the fraud, but their intentional and ongoing participation in it. This further underscores the knowing, coordinated nature of their schemes.

84.    For example, Defendants routinely initiate the IDR process despite failing to initiate or pursue open negotiations. Open negotiation is a prerequisite to IDR; providers must attempt to negotiate a resolution with health plans before initiating the IDR process. Yet from 2024 to present, the Defendants submitted hundreds of disputes for services ***where no open negotiation occurred***.

85.    Defendants cannot initiate the IDR process by mistake when they do not pursue open negotiation. As noted, the federal IDR portal's Qualifications Questions require Defendants to (1) identify the date on which they initiated open negotiations, and (2) upload documentation of open negotiations. But Defendants deliberately lie to get past this step by selecting a false and arbitrary start date for the open negotiation period and/or by generating a fictitious justification for an extension. Defendants' electronic submissions for each of these disputes was an instance of wire fraud;

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  Defendants had to put in a fabricated date, upload false documentation, generate a
2  fictitious justification for an extension, and/or otherwise overcome the IDR system's
3  safeguards to get their disputes submitted. As a result of these disputes alone, the
4  Defendants recovered hundreds of thousands of dollars in improper IDR awards.

5        86.    As another example, Defendants initiated IDR disputes that were subject
6  to California's Surprise Billing Laws and therefore ineligible. Defendants knew that
7  these disputes were ineligible; Anthem's responses to negotiations, and objections to
8  eligibility after IDR initiation, informed Defendants that the items and services were
9  subject to California's Surprise Billing Laws and therefore ineligible for the federal IDR
10 process. Moreover, the first page of the IDR initiation process provides a link to states
11 that have surprise billing laws, and CMS also publishes charts and other resources to
12 inform providers of the states with surprise billing laws and the scope and applicability
13 of those laws. *See* Notice of IDR Initiation, HHS, available at https://nsa-
14 idr.cms.gov/paymentdisputes/s/; *see also, e.g.*, CAA Enforcement Letters, CMS, *supra*;
15 Chart for Determining the Applicability for the Federal Independent Dispute Resolution
16 (IDR) Process, CMS, *supra*.

17       87.    Typically, the HaloMD Defendants—the vehicle for this fraud operation—
18 make these false attestations of eligibility when initiating the IDR process on behalf of
19 the Provider Defendants. But the Provider Defendants know full well that the services
20 at issue are ineligible and that HaloMD's attestations are false.

21       88.    As described below, in the case of the LaRoque Family Enterprise,
22 HaloMD and the LaRoque Family Providers are under common control and operate as
23 a unified enterprise, making the distinction between submitter and provider largely
24 artificial. The relationship between HaloMD and the LaRoque Family Providers is so
25 deeply entangled that the LaRoque Family Providers are, for all practical purposes,
26 making the false attestations themselves.

27       89.    In the case of the Sound Physicians Enterprise, the Sound Providers know
28 that many of the disputes HaloMD submits on their behalf are ineligible based on the

nature of the services and Anthem's communications to the Sound Providers. And in some instances, the Sound Providers initiate the knowingly ineligible IDRs themselves.

90.     In sum, the Provider Defendants are fully aware of the false attestations that HaloMD submits in their name and actively participate in the scheme by authorizing, directing, or ratifying the submissions. Their coordination with HaloMD is deliberate, sustained, and central to the execution of the fraudulent schemes.

## II.     Defendants Strategically Initiate a Massive Volume of IDR Disputes Simultaneously.

91.     To push thousands of ineligible disputes against Anthem through the IDR process with their false attestations of eligibility, Defendants also initiate a massive number of IDR disputes all at once to overwhelm the IDR system. This abuse of volume is not incidental; it is strategic to secure favorable or default outcomes when health plans and IDREs cannot keep up.

92.     Overall, the NSA's IDR process has been overwhelmed by a staggering volume of disputes that far exceed the government's initial estimates. Before the IDR process launched, CMS estimated that parties would initiate about 22,000 IDR process disputes in the first year. *See* 86 Fed. Reg. 55,980, 56,068, 56,070 (Oct. 7, 2021).

93.     The reality has shattered those estimates. The most recent government statistics show that in the second half of 2024, disputing parties—virtually all of whom are providers—initiated **853,374 disputes**, 40% more than the first half of 2024 (610,498). *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024—Dec. 31, 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2024-q3-2024-q4.pdf. This figure from **six months** is nearly **39 times** the volume of disputes that the government originally anticipated **over a full year**.

94.     Government reporting also shows that most disputes are initiated by a small number of providers and their representatives. The top ten initiating parties

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

initiated about 71% of all disputes initiated in the last six months of 2024, and the top three initiating parties initiated about 43% of all disputes during that period. *Id.*

95.    HaloMD is among the three most prolific filers of IDR process disputes. During the last six months of 2024, HaloMD initiated 134,318 disputes through the IDR process—which by itself exceeded the government's original estimate for total annual disputes **more than sixfold**. *See Federal IDR Supplemental Tables for Q3 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2024-q3.xlsx; *Federal IDR Supplemental Tables for Q4 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2024-q4-may-28-2025.xlsx. That means HaloMD was initiating an average of more than 746 disputes against health plans *per day*. *See id.*

96.    As between just the Defendants and Anthem, Defendants did not merely initiate a steady volume of IDR process disputes each day. Instead, Defendants strategically initiate hundreds of IDR process disputes against Anthem on the same day, most of which do not involve qualified IDR items or services within the scope of the NSA's IDR process.  For example, on January 5, 2024, Defendants initiated 129 separate IDR proceedings against Anthem.

97.    Defendants' goals are to interfere with Anthem's ability to effectively identify ineligible disputes and submit inappropriate payment offers, and to overwhelm the IDR system and the IDREs tasked with making applicability and payment determinations.

98.    Through considerable operational burden and expense, Anthem has crafted workflows allowing it to identify most of the unqualified items or services and notify Defendants that the disputes do not quality for IDR. Yet despite Anthem's objections, most of Defendants' ineligible disputes reach a payment determination due to Defendants' knowingly false attestations of eligibility.

99.    According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including Defendants' false

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). IDREs also complain that they spend 50% to 80% of their time on eligibility determinations. 88 Fed. Reg. 75,744, 75,753 (Nov. 3, 2023). And IDREs have no incentive to dismiss disputes due to ineligibility because they only receive compensation if a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F).

100. Thus, when receiving an avalanche of ineligible disputes from Defendants all at once, IDREs frequently rely on Defendants' false attestations of eligibility to reach and issue a payment determination on ineligible disputes.

101. Since at least 2024, about **55%** of disputes from Defendants that reached a payment determination were ineligible for the IDR process, often despite objections from Anthem. From these fraudulent submissions alone, Defendants have received several millions of dollars in illicitly obtained reimbursements.

## III. Defendants Submit Outrageous Payment Offers—Frequently Above Billed Charges—to Inflate Payments on Both Eligible and Ineligible Disputes.

102. The final step in Defendants' scheme involves inflating their reimbursement demand to levels far beyond what was billed or what the market would support. The goal is to manipulate IDREs into selecting inflated amounts by anchoring the dispute to a grossly exaggerated number. By submitting a grossly inflated offer, Defendants artificially shift the IDRE's frame of reference upward. And due to systemic issues with the IDR process, Defendants frequently prevail with their unreasonable offer—even if it is far above market rates or even above what the Provider Defendants had billed.

103. Congress directed IDR payment determinations to be made according to the QPA and several "additional circumstances," such as the training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). In practice, however, IDRE payment determinations skew heavily in favor of providers and heavily in excess of the QPA.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

104.   In the most recent reporting period, providers prevailed in **85%** of IDR payment determinations. *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024—Dec. 31, 2024*, CMS, *supra*. During that period, prevailing offers exceeded the QPA **85%** of the time. *See id.* And studies from 2024 show that when providers prevail in IDR, they prevail at a median rate of over three times the QPA. *See* Zachary L. Baron et al., O'NEILL INSTITUTE, GEORGETOWN LAW, *2023 Data from the Independent Dispute Resolution Process: Select Providers Win Big*, available at [https://oneill.law.georgetown.edu/publications/2023-data-from-the-independent-dispute-resolution-process-selectproviders-win-big/](https://oneill.law.georgetown.edu/publications/2023-data-from-the-independent-dispute-resolution-process-selectproviders-win-big/).

105.   Defendants know that IDREs select the provider's offer in more than 8 out of every 10 payment determinations, so they can frequently prevail with outrageous offers.

106.   Defendants also know that IDREs cannot consider the provider's charges when making a payment determination. 42 U.S.C. § 300gg-111(c)(5)(D). Congress prohibited IDREs from considering "inflated," "non-market based rates such as the providers' billed charges" because merely **considering** the provider's charge "may drive up consumer costs." H.R. Rep. No. 116-615, at 53, 57.

107.   With full knowledge that IDREs cannot consider the Provider Defendants' billed charges, Defendants do not disclose their billed charges to the IDRE and then submit offers that ***actually exceed the Provider Defendants' charges***.

108.   Since at least 2024, Defendants fraudulently submitted thousands of inflated disputes through the IDR process where they requested and received an IDR award exceeding their billed charges. On average, Defendants' offers of payment in IDR represent an astonishing **8,609%** more than Anthem's QPA—***resulting in IDR determinations exceeding billed charges by over $2.5 million***.

109.   These amounts far exceed what the Provider Defendants could expect to receive for their services from patients or from health plans in a competitive market. Indeed, upon information and belief, prior to the enactment of the NSA, the Provider

Defendants rarely, if ever, recovered their full billed charges from patients or health plans. They *never* collected amounts above their charges. But through their scheme to exploit the IDR process, Defendants' systematic requests for these exorbitant amounts intentionally exploit the IDR process for undue gains at Anthem's expense.

## IV.    Defendants' Fraudulent Scheme Damages Anthem, Affiliated Health Plans, and Consumers.

110.    As a result of Defendants' unlawful conduct, Anthem and its affiliated health plans have paid excessive amounts for medical services and incurred unnecessary administrative and arbitration fees. The financial harm caused by Defendants' abusive practices is ongoing and threatens the affordability and sustainability of health benefits for Anthem's members.

111.    For a period from January 4, 2024, to April 30, 2025, Anthem's records show that Defendants initiated at least 2,205 IDR proceedings against Anthem. However, the earliest publicly available data published by CMS shows that the Provider Defendants were parties to IDR determinations against Anthem in 2023, so the scheme likely began then or before.

112.    Anthem determined that approximately *55%* of the disputes from this period were ineligible for IDR for reasons like failure to initiate mandatory open negotiations, the services were not covered by the patient's health plan, or California's Surprise Billings Laws governed the dispute, among others. For these ineligible disputes catalogued in Anthem's data, Defendants illicitly secured *several millions of dollars* in improper IDR awards (hundreds of thousands of dollars which the Provider Defendants improperly recovered as a result of fraudulently inflating their payment offers far above their billed charges).

113.    Anthem also determined that Defendants fraudulently inflated their offers above the Provider Defendants' billed charges in over one hundred eligible disputes from this period. For these inflated offers catalogued in Anthem's data, Defendants improperly recovered *more than one million dollars* above the billed charges.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

# THE LAROQUE FAMILY ENTERPRISE

114.    The LaRoque Family Providers and the HaloMD Defendants do not operate as separate, independent actors. Rather, they are components of a single fraudulent enterprise, controlled and directed by a closely-knit group of individuals with overlapping roles, shared infrastructure, and a unified financial interest in exploiting the IDR process and defrauding payors like Anthem. Their supposed separateness is a façade designed to conceal the coordinated nature of the scheme.

115.    Defendant Alla LaRoque and her husband, Scott LaRoque, are at the center of the LaRoque Family Enterprise. The LaRoque Family Enterprise operates via a web of interrelated corporate entities they directly or indirectly control, including HaloMD and the LaRoque Family Providers.

116.    Scott LaRoque, a Texas resident, is the founder and Chief Executive Officer of MPOWERHealth. Based in Addison, Texas, MPOWERHealth serves more than 400 physicians, 55,000-plus patients and over 300 facilities in 24 states, including California. MPOWERHealth is located at 5080 Spectrum Drive, Suite 1100E, Addison, Texas, 75001 (the "**5080 Spectrum Address**") and, according to public records, is also associated with the address 2915 W Bitters Rd, San Antonio, Texas, 78248 (the "**2915 W Bitters Address**").

117.    Alla LaRoque, HaloMD, and the LaRoque Family Providers have discrete connections to the LaRoques and MPOWERHealth and specific roles within the LaRoque Family Enterprise.

## I.    Defendant Alla LaRoque

118.    Defendant Alla LaRoque, the wife of Scott LaRoque, is the founder and President of HaloMD.  She sits on the board of MPOWERHealth and previously served as MPOWERHealth's Chief Operating Officer.

119.    As the founder and President of HaloMD, Alla LaRoque had intimate knowledge about the core aspects of HaloMD's business operations, including the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

wrongful activities alleged herein. She runs HaloMD as a hands-on manager, overseeing the company's operations, business practices, and finances.

120.   Alla LaRoque presents herself as an authority on the NSA's IDR process and frequently appears at public events to bolster her profile. However, behind the scenes, her actions subvert and exploit the NSA and the IDR process.

121.   Under the guise of "fair reimbursement," she has repeatedly pushed agendas that undermine the balance of the IDR process, often guiding providers to exploit loopholes and procedural gaps in the IDR framework—giving providers "tactical tools to optimize reimbursement," regardless of the merit of their claims.

122.   She also has, on multiple occasions, argued that payors (like Anthem) should face punitive consequences for asserting eligibility objections—even when such objections are valid.

## II.   Defendant HaloMD

123.   HaloMD is the vehicle through which Defendants flood the IDR process with knowingly ineligible disputes.

124.   HaloMD markets itself as "the premier expert in Independent Dispute Resolution (IDR) … Our deep expertise, advanced technology, and strategic legal approaches position us as leaders in this space … [W]e empower out-of-network providers to secure sustainable, predictable revenue streams. Backed by a dedicated team and industry-leading success rates, we deliver the financial outcomes that health care providers, practice leaders, and executives rely on for long-term financial stability." *See* https://halomd.com/ (last visited June 1, 2025).

125.   HaloMD represents out-of-network providers who were key drivers in surprise billing, including IONM, anesthesiology, and emergency providers, and administers the IDR process on their behalf.

126.   HaloMD touts its "proprietary platform" as one founded with "advanced technology and AI-driven infrastructure[.]" *Id*. HaloMD also represents that it "instantly assesses each case for eligibility under The No Surprises Act and relevant state

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

regulations." Providers submit services for dispute in the IDR process through HaloMD's portal. *Id.*

127.    HaloMD further represents that it "gathers and organizes the necessary documentation [from the provider], [and] prepar[es] a compelling case that highlights the provider's position, ensuring nothing is overlooked[.]" *Id.*

128.    Upon information and belief, HaloMD leverages AI as part of its fraudulent billing scheme to flood the IDR system with ineligible disputes.

129.    HaloMD operates on a commission-based reimbursement model. Its website states: "We don't get paid until you get paid." *Id.* HaloMD thus has a financial incentive to (1) bring as many services as possible through the IDR process, regardless of the merits or the applicability of the NSA to those disputes, and (2) seek the highest possible monetary award for its provider clients in the IDR process. The LaRoque Family Providers and the Sound Providers share these same financial incentives.

130.    In addition to serving as the fraud vector for massive volumes of NSA IDR filings, HaloMD is connected to the LaRoque Family Enterprise through Alla LaRoque, its founder and President. By serving as the founder and President of HaloMD and board member for MPOWERHealth, Alla LaRoque oversees and directs the activities of both the platform submitting IDR disputes and the LaRoque Family Providers on whose behalf those disputes are submitted.

131.    Social media posts confirm the family-run, tightly coordinated nature of the enterprise. In one post from April 2025, Scott and Alla LaRoque are described as "[t]he magnificent couple, owner, founder of MPower Health and HaloMD." They routinely appear together at public events representing both companies.

132.    Megan Rausch, the Chief Operating Officer of HaloMD, also serves as the Vice President of Revenue Cycle Management for MPOWERHealth, ensuring alignment and coordination across the scheme.

133.    MPOWERHealth and HaloMD also appear to share a physical business address, reinforcing the integration between the two companies. According to public

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

records, HaloMD uses the 2915 W Bitters Address that MPOWERHealth also uses. MapQuest and other mapping tools confirm that both HaloMD and MPOWERHealth list the 5080 Spectrum Address as their business address. This physical overlap is additional confirmation that these entities are operating not independently, but as components of a single, centralized operation.

134.   The websites for HaloMD and MPOWERHealth are also nearly identical in design and structure, and their contact pages are directly linked. HaloMD's "Join Our Team" page links applicants back to MPOWERHealth's domain. Advertisements for jobs posted on the internet conflate the various entities. For example, one advertisement for a "State IDR Specialist" lists the employer as MPOWERHealth, but in the body of the description under the section "Who We Are" lists HaloMD as the employer and describes HaloMD.

**III.    The LaRoque Family Providers**

135.   The LaRoque Family Enterprise uses the LaRoque Family Providers' purported services as the basis for initiating IDR process disputes.

136.   Public records show that the LaRoque Family Providers are all IONM providers affiliated with the same company: MPOWERHealth. In addition, each of the LaRoque Family Providers is connected with the LaRoque Family Enterprise in a variety of ways, including physical addresses, shared personnel, shared assets and various employment and consulting arrangements.

137.   Per California Secretary of State records, Defendant Bruin lists the 5080 Spectrum Address as its principal address and the 2915 W Bitters Address as its mailing address. According to the National Provider Identifier ("**NPI**") registry, Bruin also has a mailing address of 1141 N Loop 1604 E #105-612, San Antonio, Texas, 78232 (the "**1141 N Loop Address**"). Upon information and belief, the 1141 N Loop Address is frequently associated with MPOWERHealth entities. The NPI registry's Authorized Official for Bruin is Roxanna ("**Roxy**") Laroque, Director of Client Experience at MPOWERHealth.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

138.    Bruin is also affiliated with Medsurant, LLC ("**Medsurant**"), which operates under the trade name Medsurant Health. Upon information and belief, in or around January 2025, Medsurant was acquired by MPOWERHealth. According to the NPI registry, Medsurant also has a business address at the 5080 Spectrum Address. Roxy Laroque of MPOWERHealth is listed as its Authorized Official. In addition, Medsurant recently filed a change of registered agent with the California Secretary State that shows it was filed by Emily Campbell from the 5080 Spectrum Address. Upon information and belief, Campbell is MPOWERHealth's Manager of Client Relations.

139.    Dr. Robin Soffer, CEO of Bruin, lists herself on LinkedIn as a Medsurant employee. IDR disputes submitted on behalf of both Bruin and Medsurant use the same email address: medsurantarbitrationnsa@halomd.com. In addition, Medsurant holds a perfected security interest in all of Bruin's assets, as evidenced by a UCC-1 financing statement.

140.    Defendant iNeurology lists 1141 N Loop as its current mailing address and previously used 2915 W Bitters Road for the same purpose. According to the NPI registry, its Authorized Official is Roxy LaRoque of MPOWERHealth.

141.    Defendant LANA uses both the 2915 W Bitters and 1141 N Loop Addresses as its mailing address. Its CEO, Dr. Jared Ament, is also a lead research consultant at MPOWERHealth and has spoken publicly about the company.  Emily Campbell from MPOWERHeath is listed on LANA's Statement of Information filed with the California Secretary of State. And according to the NPI registry, its Authorized Official is Roxy LaRoque of MPOWERHealth.

142.    Defendants N Express and NANA also use both the 2915 W Bitters and 1141 N Loop Addresses as their mailing address. According to the NPI registry, their Authorized Official is Roxy LaRoque of MPOWERHealth. NANA also lists Brenda Thiele on its Statement of Information, whose LinkedIn reflects she is MPOWERHealth's Senior Manager of Treasury and former Chief of Staff and Director of Operations.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

143.    In sum, the LaRoque Family Providers are not independent clients of HaloMD. They are closely linked through shared ownership, leadership, staff, branding, web infrastructure, and physical office space. MPOWERHealth connects and coordinates the activities of all Defendants. HaloMD, far from being a neutral billing platform, operates as an engine of fraud—instrumental in executing a scheme designed to exploit the IDR process for unlawful financial gain.

### THE SOUND PHYSICIANS ENTERPRISE

144.    Like the LaRoque Family Enterprise, the Sound Providers and the HaloMD Defendants do not operate as separate, independent actors. Rather, they function as interdependent participants in a unified scheme designed to exploit the IDR process and defraud Anthem. The Sound Providers are not autonomous local practices; they are integrated components of a national hospitalist staffing enterprise that centrally manages legal, billing, and IDR functions. HaloMD serves as a key agent and operational partner of the enterprise, submitting disputes on behalf of the Sound Providers using a standardized platform and shared communications infrastructure. Their coordinated actions, mutual financial incentives, and repeated patterns of conduct demonstrate a shared intent to pursue improper IDR payments on a mass scale. The HaloMD Defendants and the Sound Providers operated with integrated, enterprise-level coordination behind the scheme.

145.    The Sound Providers are subsidiaries or affiliates of Sound Inpatient Physicians, Inc. d/b/a Sound Physicians ("**Sound Physicians**"), a national multi-specialty medical group headquartered in Tacoma, Washington. Sound Physicians publicly claims to employ over 4,000 clinicians and to manage approximately 6% of all acute hospitalizations across more than 400 hospitals nationwide. *See* https://soundphysicians.com/about/why-sound/.

146.    Lindsay Vaughan, Associate General Counsel of Sound Physicians, served as incorporator for both Sound Providers. She also signed annual registration statements

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

for the two entities, confirming their centralized legal oversight from within the parent organization.

147.   The Sound Providers share resources and intermingle operations with respect to the submission of healthcare claims, payment for healthcare services, and pursuit of IDR. Anthem has identified multiple claims and IDR submissions across the Sound Providers that used the same remittance address—P.O. Box 748996, Los Angeles, CA 90074-8996—a centralized billing address listed on Sound Physicians' own website for emergency medicine payments. *See* https://soundphysicians.com/patient-resources/. The open negotiation notices for NSA disputes involving the Provider Defendants also originated from this same national billing address, confirming the shared infrastructure and control over the dispute process.

148.   HaloMD filed IDR disputes for the Sound Providers using a centralized, Sound-branded email address: soundnsa@halomd.com. This address appears repeatedly in NSA filings involving the Sound Providers.

149.   In sum, the relationship between the Sound Providers and the HaloMD Defendants was not passive. Together, they coordinated to pursue shared financial interests—maximizing the number of disputes submitted and inflating payment demands well beyond their billed charges or market rates. The use of HaloMD as a submission engine was not incidental or isolated; it was a deliberate component of the Sound Physicians Enterprise's strategy to bypass the limitations of individual-provider capacity, automate the submission of disputes en masse, and conceal the ineligibility or inflation embedded in each claim.

## IV.    The Enterprises Exploit the IDR Process at the Expense of Anthem.

150.   Defendants formed the LaRoque Family Enterprise and the Sound Physicians Enterprise for the common purpose of enriching themselves at the expense of Anthem by fraudulently inducing and compelling Anthem to pay for services that

COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

were not eligible for the IDR process, and inflating the amounts required to be paid on ineligible and eligible services above the amounts billed to patients.

151.   Beginning no later than January 2024, the LaRoque Family Enterprise and the Sound Physicians Enterprise both commenced a pattern of fraudulent, intentional, and reckless activity whereby they: (1) knowingly submitted thousands of ineligible and inflated disputes to Anthem, misrepresenting their eligibility for IDR under the NSA; (2) strategically initiated massive volumes of IDR disputes simultaneously against Anthem; and (3) improperly inflated payment offers that far exceeded what the Provider Defendants could have received from patients or health plans in a competitive market and, in many cases, exceeded the Provider Defendants' billed charges.

152.   These disputes included services governed by state law, services for which no open negotiation had been initiated, or services otherwise barred from IDR. Despite these disqualifying facts, Defendants knowingly submitted formal attestations to Anthem, the Departments, and the IDRE asserting that the disputes were eligible—false statements that enabled the disputes to advance through the IDR system. In many instances, Anthem had previously notified Defendants that the claims were ineligible, and that state law governed reimbursement, yet Defendants proceeded anyway. Each step of the schemes was designed to bypass the statutory and regulatory prerequisites of the NSA while creating the illusion of compliance.

153.   Between January 4, 2024, and April 30, 2025, the LaRoque Family Enterprise and the Sound Physicians Enterprise submitted thousands of ineligible disputes against Anthem via interstate wires for which it illicitly secured millions of dollars in improper IDR awards. On each occasion, Defendants knowingly misrepresented the eligibility of their disputes.

154.   In addition, between January 4, 2024, and April 30, 2025, the LaRoque Family Enterprise and the Sound Physicians Enterprise submitted inflated payment offers in over one hundred eligible disputes against Anthem via interstate wires for

which it received over one million dollars above the Provider Defendants' billed charges.

155.   The LaRoque Family Enterprise's and the Sound Physicians Enterprise's fraudulent schemes are evidenced by numerous specific predicate acts of wire fraud, including but not limited to the following:

**A. Los Angeles Neurological Associates**

***DISP-801389 (No Open Negotiation; Misrepresentation of QPA)***

156.   The IDR proceeding captioned DISP-801389 involved a service that LANA rendered on August 24, 2023, to a member of a health plan administered by Anthem.  LANA billed $6,800 for this service.



157.   Neither LANA nor HaloMD pursued open negotiations under the federal process, which is a mandatory prerequisite to IDR for eligible services. Despite no open negotiation and the dispute not being subject to IDR for that reason, HaloMD, on behalf of and in coordination with LANA, ***falsely certified that the open negotiation period started on October 21, 2023,*** when it submitted the claim to IDR.

> **When did the open negotiation period start?**
> 10/21/2023

158.   On December 6, 2023, HaloMD on behalf of and in coordination with LANA, using the email address nsa@halomd.com, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

159.   When initiating IDR, HaloMD, on behalf of and in coordination with LANA, also falsely certified that the QPA for the claim was $3,840.18. This was ***nearly 20 times*** the correct QPA, which, per Anthem, was calculated at $198.70. As noted, the NSA directs IDREs to consider the QPA and several "additional circumstances" when making payment determinations. 42 U.S.C. § 300gg-111(c)(5)(C).

**Qualifying Payment Amount (QPA):**
$3840.18

160.   Anthem submitted an objection to eligibility, which was also addressed to LANA, stating that "[t]he non-participating provider/facility failed to engage in the 30-business day open negotiation period." Neither HaloMD nor LANA withdrew the dispute following Anthem's explicit notice of ineligibility.

September 30, 2024

LOS ANGELES NEUROLOGICAL

DISP ID: DISP-801389

Dear CIDRE,
The Independent Dispute Resolution (IDR) Team has received an IDR initiation notice for the above DISP Number. After review, the claim(s) is/are out of the scope (OOS) of the Federal No Surprises Act (NSA), due to the following reason(s). Please refer to the addendum for more information.

☐ The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies. Per CMS guidelines, where a specified state law provides a method for determining the total amount payable for out-of-network items and services, providers may not engage in the federal IDR process for resolving payment disputes under the NSA.

☑ The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA. Providers cannot pursue IDR unless and until the open negotiation period is properly initiated and completed. Per CMS regulations, providers must submit open negotiation notices to the contact information set forth in their initial payment or denial of payment. [Insert HealthPlan] accepts open negotiation notices through the following: Availity, Mail to a specified address, Fax to a specified number, Email to a specified address Via phone to a specified number

161.   As a result of HaloMD and LANA's fraudulent attestations, Anthem was required to pay $9,843.3 for the ineligible services—***nearly 50 times the correct QPA for the service and more than $3,000 more than the amount LANA originally billed Anthem for the service***—along with $698 in unnecessary IDR-related fees.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*REED SMITH LLP*
*A limited liability partnership formed in the State of Delaware*

***DISP-807329 (No Open Negotiation)***

162. The IDR proceeding captioned DISP-807329 involved an electroencephalogram monitoring service that LANA rendered on August 24, 2023, to a member of a health plan administered by Anthem.

163. Neither LANA nor HaloMD pursued open negotiations under the federal process, which is a mandatory prerequisite to IDR for eligible services. Despite no open negotiation and the dispute not being subject to the NSA, HaloMD, on behalf of and in coordination LANA, certified that the open negotiation period started on October 21, 2023, when it submitted the claim to arbitration.

164. On December 8, 2023, HaloMD, on behalf of and in coordination with LANA, using the email address nsa@halomd.com, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process.

165. Anthem submitted an objection to eligibility, which was also addressed to LANA, stating that the "[t]he non-participating provider/facility failed to engage in the 30-business day open negotiation period." Neither HaloMD nor LANA withdrew the dispute following Anthem's explicit notice of ineligibility.

166. As a result of HaloMD and LANA's fraudulent attestations, Anthem was required to pay $5,100 for the ineligible service, equal to LANA's billed charge for the service, along with $445 in unnecessary IDR-related fees.

### B. Bruin Neurophysiology

***DISP-1151152 (No Open Negotiation)***

167. The IDR proceeding captioned DISP-1151152 involved a service that Bruin rendered on October 10, 2023, to a member of a health plan administered by Anthem.

168. Neither Bruin nor HaloMD pursued open negotiations under the federal process as required. Yet on March 14, 2024, HaloMD, on behalf of and in coordination with Bruin, initiated IDR and falsely attested to IDR eligibility. Notably, HaloMD

1  initiated the IDR using the email address medsurantarbitrationnsa@halomd.com, a

2  company owned by MPOWERHealth, despite Bruin providing the service.

3      169.   Anthem submitted an objection to eligibility, which was also addressed to

4  Robin Soffer at Bruin, stating that Bruin "failed to engage in the 30-business day open

5  negotiation period" required by the NSA. Neither HaloMD nor Bruin withdrew the

6  dispute following Anthem's explicit notice of ineligibility.

7      170.   As a result of HaloMD and Bruin's fraudulent attestations, Anthem was

8  required to pay $8,746.30 for the service along with $765 in unnecessary IDR-related

9  fees.

10  ***DISP-918898 (Late Filing)***

11      171.   The IDR proceeding captioned DISP-918898 involved a service that Bruin

12  rendered on May 22, 2023, to a member of a health plan administered by Anthem.

13      172.   On July 17, 2023, HaloMD, acting on behalf of and in coordination with

14  Bruin, sent a notice of open negotiation to Anthem to initiate the federal IDR process.

15  HaloMD sent the open negotiation notice using the email address

16  medsurantarbitrationnsa@halomd.com with Ashonta.Whitehead@halomd.com copied.

17  The open negotiation notice was signed by Megan Rausch (HaloMD), noted to be the

18  "Provider Representative," at the 2915 W Bitters Address.

19      173.   On September 25, 2023, Anthem addressed its response to the notice of

20  open negotiation to Bruin, ATTN: Megan Rausch, at the 2915 W. Bitters Address,

21  stating that the services included on the request "were paid at the maximum amount as

22  required by the member's health plan" and that "no additional payment can be

23  considered." Neither HaloMD nor Bruin responded to Anthem's September 25, 2023,

24  letter.

25      174.   More than ***one full year*** after Anthem's letter, on January 15, 2025,

26  HaloMD, on behalf of and in coordination with Bruin, using the email address

27  nsa@halomd.com, falsely attested to IDR eligibility. Anthem submitted an objection to

28  eligibility asserting that Bruin had not filed its IDR proceeding within the required time.

REED SMITH LLP<br>A limited liability partnership formed in the State of Delaware

The notice of ineligibility was sent to both Bruin and HaloMD, yet neither HaloMD nor Bruin withdrew the dispute.

175.   As a result of HaloMD and Bruin's fraudulent attestations, Anthem was required to pay $12,993.28—***103 times the QPA calculated by HaloMD and Bruin at the initiation of the IDR proceeding***. Anthem also paid $750 in unnecessary IDR-related fees.

### C. North American Neurological Associates

### *DISP-1455557 (No Open Negotiation)*

176.   The IDR proceeding captioned DISP-1455557 involved a service that NANA rendered on March 11, 2024, to a member of a health plan administered by Anthem.

177.   When Anthem issued payment, which was equal to the QPA for the service, the EOB sent to NANA at the 1141 N Loop Address reflected that the claim was processed pursuant to explanation code AUQ. The description of this code, printed at the end of the EOB, indicated: "This claim was paid according to the Federal No Surprises Act. … If you disagree with our decision, you can initiate the 30-day open negotiation period[.]" Neither NANA, nor HaloMD acting on its behalf, initiated the 30-day open negotiation period as required.

178.   Even though neither NANA nor HaloMD initiated open negotiations for this service, on June 27, 2024, HaloMD, using the email address nsa@halomd.com, on behalf of and in coordination with NANA, initiated IDR and falsely attested that the service was a qualified item or service within the scope of the federal IDR Process and that NANA and/or HaloMD had complied with the requirements of the NSA in submitting the claim.

179.   On December 11, 2024, Anthem submitted an objection to eligibility, which was also addressed to NANA, stating, "The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA. Providers cannot pursue IDR unless and until the open negotiation period is properly

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  initiated and completed." Neither HaloMD nor NANA withdrew the dispute following
2  Anthem's explicit notice of ineligibility.

3      180.    As a result of HaloMD's and NANA's fraudulent attestations, Anthem was
4  required to pay $7,369 for the ineligible service along with $512 in unnecessary IDR-
5  related fees.

6  ***DISP-1455555 (No Open Negotiation)***

7      181.    The IDR proceeding captioned DISP-1455555 involved a service that
8  NANA rendered on March 11, 2024, to a member of a health plan administered by
9  Anthem.

10     182.    When Anthem issued payment, which was equal to the QPA for the
11 service, the EOB sent to NANA at the 1141 N Loop Address reflected that the claim
12 was processed pursuant to explanation code AUQ. The description of this code, printed
13 at the end of the EOB, indicated: "This claim was paid according to the Federal No
14 Surprises Act. … If you disagree with our decision, you can initiate the 30-day open
15 negotiation period[.]" Neither NANA, nor HaloMD acting on its behalf, initiated the
16 30-day open negotiation period as required.

17     183.    Even though neither NANA nor HaloMD initiated open negotiations for
18 this service, on June 27, 2024, HaloMD, using the email address nsa@halomd.com, on
19 behalf of and in coordination with NANA, initiated IDR and falsely attested that the
20 service was a qualified item or service within the scope of the federal IDR Process and
21 that NANA and/or HaloMD had complied with the requirements of the NSA in
22 submitting the claim.

23     184.    On December 11, 2024, Anthem submitted an objection to eligibility,
24 which was also addressed to NANA, stating "The non-participating provider/facility
25 failed to engage in the 30-business day open negotiation period, according to the NSA.
26 Providers cannot pursue IDR unless and until the open negotiation period is properly
27 initiated and completed." Neither HaloMD nor NANA withdrew the dispute following
28 Anthem's explicit notice of ineligibility.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

185.   As a result of HaloMD and NANA's fraudulent attestations, Anthem was required to pay $9,843.83—***approximately $3,000 more than NANA's billed charges***—along with $512 in unnecessary IDR-related fees.

**D. N Express**

***DISP-2193991 (No Open Negotiation; Ineligible State Law Claim)***

186.   The IDR proceeding captioned DISP-2193991 involved a service that N Express rendered on October 23, 2023, to a member of a health plan administered by Anthem. The member's plan is subject to state law, and therefore, California's Surprise Billing Laws—rather than the NSA—governed the reimbursement rate for services.

187.   Neither N Express nor HaloMD pursued open negotiations under the federal process, which is a mandatory prerequisite to IDR for eligible services. Despite no open negotiation and clear application of California's Surprise Billing Laws, on December 2, 2024, "CJR" of HaloMD, using the email address nsa@halomd.com, on behalf of and in coordination with N Express, initiated IDR and falsely certified the service as IDR-eligible.

188.   On December 6, 2024, Anthem submitted an objection to eligibility, which was also address to N Express, stating: (1) "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies" and (2) "The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA. Providers cannot pursue IDR unless and until the open negotiation period is properly initiated and completed." Neither HaloMD nor N Express withdrew the dispute following Anthem's explicit notice of ineligibility.

189.   As a result of HaloMD and N Express's fraudulent attestations, Anthem was required to pay $7,769.59—***more than double the billed amount*** of $3,825—along with $510 in unnecessary IDR-related fees.

***DISP-2193967 (No Open Negotiation; Ineligible State Law Claim)***

190.   The IDR proceeding captioned DISP-2193967 involved a service that N Express rendered on October 23, 2023, to a member of a health plan administered by

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Anthem. The member's plan is subject to state law and, therefore, California's Surprise Billing Laws—rather than the NSA—governed the reimbursement rate for services.

191.   Neither N Express nor HaloMD pursued open negotiations under the federal process, which is a mandatory prerequisite to IDR for eligible services. Yet despite no open negotiation and clear application of California's Surprise Billing Laws, on December 2, 2024, "CJR" of HaloMD, using the email address nsa@halomd.com, on behalf of and in coordination with N Express, initiated IDR and falsely certified the service as IDR-eligible.

192.   On December 6, 2024, Anthem submitted an objection to eligibility, which was also address to N Express, stating: (1) "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies" and (2) "The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA. Providers cannot pursue IDR unless and until the open negotiation period is properly initiated and completed." Neither HaloMD nor N Express withdrew the dispute following Anthem's explicit notice of ineligibility.

193.   As a result of HaloMD and N Express's fraudulent attestations, Anthem was required to pay $12,330.78 for the ineligible service along with $510 in unnecessary IDR-related fees.

### DISP-945678 (No Open Negotiation; Ineligible State Law Claim)

194.   The IDR proceeding captioned DISP-945678 involved a service that N Express rendered on October 23, 2023, to a member of a fully insured group health plan administered by Anthem. The member's plan is subject to state law and, therefore, California's Surprise Billing Laws—rather than the NSA—governed the reimbursement rate for services.

195.   Neither N Express nor HaloMD pursued open negotiations under the federal process, which is a mandatory prerequisite to IDR for eligible services. Yet despite no open negotiation and clear application of California's Surprise Billing Laws, on December 2, 2024, HaloMD, using the email address nsa@halomd.com, on behalf

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

of and in coordination with N Express, initiated IDR and falsely certified the service as IDR-eligible.

196.   Anthem submitted an objection to eligibility, which was also address to N Express, stating: (1) "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies" and (2) "The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA. Providers cannot pursue IDR unless and until the open negotiation period is properly initiated and completed." Neither HaloMD nor N Express withdrew the dispute following Anthem's explicit notice of ineligibility.

197.   As a result of HaloMD and N Express's fraudulent attestations, Anthem was required to pay $7,769.59—***nearly double the billed amount*** of $3,825—along with $510 in unnecessary IDR-related fees.

**E. iNeurology**

**_DISP-1568048 (No Open Negotiation)_**

198.   The IDR proceeding captioned DISP-1568048 involved a service that iNeurology rendered on August 14, 2023, to a member of a health plan administered by Anthem.

199.   When Anthem issued payment, the EOB sent to iNeurology at the 2915 W Bitters Address reflected that the claim was processed pursuant to explanation code AUQ. The description of this code, printed at the end of the EOB, indicated: "This claim was paid according to the Federal No Surprises Act. … If you disagree with our decision, you can initiate the 30-day open negotiation period[.]" Neither iNeurology, nor HaloMD acting on its behalf, initiated the 30-day open negotiation period as required.

200.   Even though neither iNeurology nor HaloMD initiated open negotiations for this service, on April 11, 2025, HaloMD, using the email address nsa@halomd.com, on behalf of and in coordination with iNeurology, initiated IDR and falsely attested to IDR eligibility.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

201.   On April 24, 2025, Anthem submitted an objection to eligibility, which was also addressed to iNeurology, stating: "The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA. Providers cannot pursue IDR unless and until the open negotiation period is properly initiated and completed." Neither HaloMD nor iNeurology withdrew the dispute following Anthem's explicit notice of ineligibility.

202.   As a result of HaloMD and N Express's fraudulent attestations, Anthem was required to pay $12,330.78 for the ineligible service along with $490 in unnecessary IDR-related fees.

### DISP-937342 (No Open Negotiation; Non-Covered Service)

203.   The IDR proceeding captioned DISP-937342 involved a service that iNeurology rendered on September 19, 2023, to a member of a health plan administered by Anthem. Anthem denied reimbursement for the service because it was not separately payable from a service that had already been billed and paid. No QPA applied to this claim because the NSA and IDR were inapplicable.

204.   Even though neither iNeurology nor HaloMD initiated open negotiations for this service, on January 22, 2024, HaloMD, using the email address nsa@halomd.com, on behalf of and in coordination with iNeurology, initiated IDR and falsely attested to IDR eligibility.

205.   Anthem submitted an objection to eligibility, which was also addressed to iNeurology at the 2915 W Bitters Address, asserting that "the non-participating provider/facility failed to engage in the 30-business day open negotiation period." Neither HaloMD nor iNeurology withdrew the dispute following Anthem's explicit notice of eligibility.

206.   As a result of HaloMD and iNeurlogy's fraudulent attestations, Anthem was required to pay $7,309.58—*more than six times the billed amount* of $1,275— along with $510.00 in unnecessary IDR-related fees, on a service for which no plan benefits were payable in the first place.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**F. Sound Physicians Emergency Medicine of Southern California**

***DISP-932222 (Incorrect Batching)***

207.   The IDR proceeding captioned DISP-932222 involved emergency services that SPEMSC rendered between September 20, 2023, and October 31, 2023. One service disputed in this proceeding was rendered to a member of a health plan insured and administered by Anthem. SPEMSC billed $1,761.00 in charges for the service.

208.   Anthem approved payment for the service and sent its EOB to Sound Physicians at the address PO Box 748524, Los Angeles, California, 90074.

209.   On November 30, 2023, SPEMSC, using the email address SoundFedIDR@SoundPhysicians.com, sent a notice of open negotiation, signed by Melissa Williams at Sound Physicians, to Anthem to initiate the federal IDR process. The notice of open negotiation attached a spreadsheet with dozens of claims that included the fully insured claim subject to DISP-932222. Anthem sent a response to SPEMSC offering additional payment to settle the dispute and inviting SPEMSC to submit additional information to support why it is entitled to greater reimbursement to continue discussions. SPEMSC did not respond to this correspondence.

210.   On November 13, 2024, SPEMSC initiated a batched IDR using the email soundfedidr@soundphysicians.com. SPEMSC falsely attested that the services were qualified and within the scope of the federal IDR process despite the fact the dispute was ineligible for multiple reasons, including that SPEMSC inappropriately included services rendered to members of self-funded Anthem plans and non-Anthem plans in addition to the services rendered to a member of a fully insured Anthem plan.

211.   Anthem responded to the IDR initiation to assert that IDR was not applicable to the dispute, stating in part: "Batched services include multiple Membership types," and providing a chart of all disputed services with the membership type attributable to each claim (*e.g.*, "ASO" and "Fully Insured".) SPEMSC did not withdraw the dispute. Nevertheless, as a result of SPEMSC's fraudulent attestation,

Anthem was required to pay $1,761 for this specific unqualified service along with $900 in unnecessary IDR-related fees related to the improperly batched dispute.

### *DISP-1289721 (Ineligible Medicaid Claim; No Open Negotiation)*

212.    The IDR proceeding captioned DISP-1289721 involved emergency services that SPEMSC rendered on February 9, 2024, to a member of a Medicaid managed care plan administered by Anthem. Anthem paid the Medicaid rate of $44.60 for the service. No QPA applied to this claim because the NSA and IDR were inapplicable.

213.    Neither SPEMSC, nor HaloMD acting on its behalf, initiated open negotiations for this service. Yet on October 23, 2024, HaloMD, using the email address soundnsa@halomd.com, on behalf of and in coordination with SPEMSC, initiated IDR and falsely attested to IDR eligibility.

214.    Anthem submitted an objection to eligibility, asserting that the dispute was ineligible for IDR under the NSA because it involved a "Medicare/ Medicaid claim ineligible for NSA." Anthem also asserted: "The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA." This notice of ineligibility was sent to both HaloMD and SPEMSC, yet neither HaloMD nor SPEMSC withdrew the dispute. Nevertheless, as a result of HaloMD and SPEMSC's fraudulent attestations, Anthem was required to pay $1,880—which was more than SPEMSC billed for the service and more than 42 times the Medicaid rate—along with $915 in unnecessary IDR-related fees.

### *DISP-1568233 (Ineligible State Law Claim)*

215.    The IDR proceeding captioned DISP-1568233 involved emergency services that SPEMSC rendered on February 7, 2024, to a member of a fully insured health plan administered by Anthem. The member's plan is subject to state law and,

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

therefore, California's Surprise Billing Laws—rather than the NSA—governed the reimbursement rate for services.

216.    On June 5, 2024, even though SPEMSC and HaloMD knew that the claim was subject to state law, HaloMD, again acting on behalf of and in coordination with SPEMSC, sent a notice of open negotiation to Anthem to initiate the federal IDR process. HaloMD sent the open negotiation notice using the email address soundnsa@halomd.com with Eden.Dimayuga@halomd.com copied. The open negotiation notice offered $2,475 to resolve the dispute and was signed by Megan Rausch (HaloMD), noted to be the "Provider Representative," at the 2915 W Bitters Address.

217.    On July 5, 2024, Anthem addressed its response to the notice of open negotiation to SPEMSC at the address for Sound Physician's headquarters (PO Box 748524), stating that the dispute did not qualify for IDR under the NSA. Neither HaloMD nor SPEMSC responded to Anthem's assertion of ineligibility.

218.    On July 22, 2024, HaloMD, on behalf of and in coordination with SPEMSC, and using the email address soundnsa@halomd.com, falsely attested to IDR eligibility. Anthem submitted an objection to eligibility asserting that IDR was not applicable to the dispute because "a state surprise billing law applies." This notice of ineligibility was sent to both HaloMD and SPEMSC, yet neither HaloMD nor SPEMSC withdrew the dispute.

219.    As a result of HaloMD and SPEMSC's fraudulent attestations, Anthem was required to pay $4,316.00, which was significantly more than HaloMD and SPEMSC had offered in open negotiations and after they had been informed that the services did not qualify for IDR. Anthem also paid $965 in unnecessary IDR-related fees.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

### G. Sound Physicians Anesthesiology of California

**_DISP-803189 (No Open Negotiation)_**

220.    The IDR proceeding captioned DISP-803189 involved anesthesia services that SPAC rendered on July 8, 2023, to a member of a health plan administered by Anthem.

221.    Neither SPAC nor HaloMD acting on its behalf initiated open negotiations for this service. On September 25, 2024, SPAC, using the email address soundfedidr@soundphysicians.com, initiated IDR and falsely attested to IDR eligibility.

222.    Anthem submitted an objection to eligibility, which was also addressed to SPAC at PO Box 741658, Los Angeles, California 90074, asserting: "The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA." SPAC did not withdraw the dispute following Anthem's explicit notice of eligibility.

223.    As a result of SPAC's fraudulent attestations, Anthem was required to pay $1,565.50, which was greater than the $945.50 amount SPAC had billed for the same service in the original claim. Anthem also paid $445.00 in unnecessary IDR-related fees.

**_DISP-2639953 (No Open Negotiation; Ineligible State Law Claim)_**

224.    The IDR proceeding captioned DISP-2639953 involved anesthesia services that SPAC rendered on November 21, 2024, to a member of a fully insured health plan administered by Anthem. As a fully insured plan, the member's plan is subject to state law, and therefore, California's Surprise Billing Laws—rather than the NSA—governed the reimbursement rate for services.

225.    On January 8, 2025, HaloMD, on behalf of and in coordination with SPAC, sent a notice of open negotiation to Anthem. The open negotiation notice was signed by Megan Rausch, noted to be the "Provider Representative," at the 2915 W Bitters

Address and with the email address soundnsa@halomd.com. HaloMD requested $1,006.24 to resolve the dispute.

226.    Anthem sent a response that was addressed to SPAC at PO Box 741658, Los Angeles, California 90074. The letter informed SPAC and HaloMD that the "[c]laim is not governed by the Federal No Surprises Act."

227.    On January 9, 2025 Anthem sent a response to SPAC address to the Sound Physicians headquarters, asserting that the "Claim is not governed by the Federal No Surprises Act." SPAC did not respond to Anthem's assertion of ineligibility.

228.    Even though the dispute clearly fell under state law and SPAC knew that the NSA did not apply, on February 25, 2025, HaloMD, on behalf of and in coordination with SPAC, using the email address soundnsa@halomd.com, initiated IDR and falsely attested to IDR eligibility.

229.    Anthem submitted an objection to eligibility, which was also addressed to SPAC, asserting: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Again, neither HaloMD nor SPAC withdrew the dispute following Anthem's explicit notice of eligibility.

230.    As a result of HaloMD and SPAC's fraudulent attestations, Anthem was required to pay $1,636.40 for the ineligible service, which was greater than the $1,016.40 amount SPAC had billed for the same service and greater than HaloMD's $1,006.24 offer to resolve the claim in open negotiations. Anthem also paid $503 in unnecessary IDR-related fees.

## CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF RICO, 18 U.S.C. § 1962(c)

### (Against All Defendants)

231.    Anthem repeats and realleges the allegations in Paragraphs 1 through 230 in this Complaint as if fully set forth at length herein.

232.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

233.   At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

234.   Defendants together formed two distinct but similarly structured association-in-fact enterprises (the LaRoque Family and Sound Physicians Enterprises), as that term is defined in 18 U.S.C. § 1961(4), for the purposes of stealing and defrauding funds from Anthem through the fraudulent submission of ineligible and inflated disputes under the federal IDR process.

235.   For several years, the LaRoque Family and Sound Physicians Enterprises have sought to illegally increase its profits by: (1) knowingly submitting false and fraudulent attestations of eligibility for services and disputes that they know are ineligible for the IDR process; (2) strategically initiating massive volumes of IDR disputes simultaneously against Anthem; and (3) improperly inflating payment offers that far exceed what the Provider Defendants could have received from patients or health plans in a competitive market and, in many case, are twice or more the Provider Defendants' billed charges.

236.   At all relevant times, the LaRoque Family and Sound Physicians Enterprises each: (a) functioned as a continuing unit with an ascertainable structure separate and distinct from the pattern of racketeering activity; (b) shared a common purpose of furthering their illegal scheme and increasing their revenues and profits at the expense of Anthem; (c) had systematic linkage to each other through interpersonal and contractual relationships, financial ties, shared correspondence, and continuing coordination of activities; and (d) had sufficient longevity for the enterprise to pursue its purpose. Each member of the LaRoque Family and Sound Physicians Enterprises

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  participated in the operation and management of the enterprises, including patterns of
2  racketeering activity, and shared in the profits illicitly obtained due to the enterprises'
3  fraudulent activity.

4      237.  The LaRoque Family and Sound Physicians Enterprises are distinct from
5  and have an existence beyond the pattern of racketeering that is described herein,
6  namely by recruiting, employing, overseeing and coordinating many individuals who
7  have been responsible for facilitating and performing a wide variety of administrative
8  and ostensibly professional functions beyond the acts of wire fraud (*i.e.*, the submission
9  of the ineligible and inflated disputes to Anthem through the IDR process), by creating
10 and maintaining records, by negotiating and executing various agreements, and by
11 maintaining the bookkeeping and accounting functions necessary to manage the receipt
12 and distribution of the insurance proceeds.

13     238.  Defendants carried out, or attempted to carry out, schemes to defraud
14 Anthem by knowingly conducting or participating, directly or indirectly, in the conduct
15 of the LaRoque Family and Sound Physicians Enterprises, as applicable, through a
16 pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that consisted
17 of numerous and repeated violations of the federal wire fraud statute, which prohibits
18 the use of any interstate wire facility for the purpose of executing a scheme to defraud,
19 in violation of 18 U.S.C. § 1343.

20     239.  Defendants committed, conspired to commit, and/or aided and abetted in
21 the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of
22 U.S.C. § 1343) within the past ten years. The multiple acts of racketeering activity that
23 the Defendants committed, or aided and abetted in the commission of, were related to
24 each other and posed a threat of continued racketeering activity, and therefore constitute
25 a "pattern of racketeering activity." The predicate acts, as applicable to each of the
26 LaRoque Family and Sound Physicians Enterprises, also had the same or similar results,
27 participants, victims, and methods. The predicate acts were related and not isolated
28 events.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

240.    Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by interstate wire for the purpose of executing the unlawful scheme to defraud funds from Anthem by means of false pretenses, misrepresentations, promises and omissions. Specifically, the disputes Defendants submitted through the federal IDR process contained uniform misrepresentations that the disputes were eligible for that process and often contained inflated amounts. The predicate acts all had the purpose of substantially harming Anthem's business and property, while simultaneously generating substantial revenues for the members of the LaRoque Family and Sound Physicians Enterprises. The predicate acts were committed or caused to be committed by Defendants through their participation in the LaRoque Family and Sound Physicians Enterprises, as applicable, and in furtherance of their fraudulent schemes.

241.    Defendants' predicate acts of racketeering—which began no later than January 2024 and have occurred continuously and systematically through the present day—committed by interstate wires, include: (a) submitting claims through the online IDR eligibility portal that were ineligible for the IDR process; (b) demanding outrageous payments far in excess of their charges, much less a commercially reasonable amount; (c) initiating over hundred disputes at the same time and in such a way as to make it difficult for Anthem to reasonably identify and object to all ineligible disputes; (d) engaging in the IDR process in bad faith; and (e) procuring payments on disputes that were ineligible for IDR and/or or grossly inflated. The fraudulent disputes submitted to Anthem that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the Sections titled "The LaRoque Family Enterprise" and "The Sound Physicians Enterprise," *supra*.

242.    The members of the LaRoque Family and Sound Physicians Enterprises all shared a common purpose to enrich themselves at the expense of Anthem by fraudulently inducing and compelling Anthem to pay exorbitant amounts for services

1   that were not eligible for the IDR process and causing Anthem to pay inflated amounts

2   for eligible services far exceeding their billed charges.

3       243.   Defendants aided and abetted others in the violations of the above laws,

4   rendering them indictable as principals in the 18 U.S.C. § 1343 offenses.

5       244.   The members of the LaRoque Family and Sound Physicians Enterprises

6   have profited, and continue to profit, substantially from the fraudulent billing scheme,

7   ultimately receiving several millions of dollars in illicitly obtained reimbursements and

8   IDR-related fees. These payments, disbursed through interstate wire facilities, each

9   constitute a separate violation of 18 U.S.C. § 1343.

10      245.   The members of the LaRoque Family and Sound Physicians Enterprises

11  knew their actions would cause harm to Anthem. Nevertheless, the members of the

12  LaRoque Family and Sound Physicians Enterprises engaged in schemes of deception,

13  that utilized the internet and wire transfers as part of their fraud, in order to steal funds

14  from Anthem by means of false pretenses, misrepresentations and omissions.

15      246.   The LaRoque Family and Sound Physicians Enterprises' fraudulent

16  conduct and participation in the racketeering activity described herein has directly and

17  proximately caused Anthem and its affiliated health plans to incur several millions of

18  dollars in damages.

19      247.   By reason of its injury, Anthem is entitled to compensatory, punitive, and

20  treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in

21  bringing this action, and any other relief the Court deems just and proper.

22                          **COUNT II**

23              **VIOLATION OF RICO, 18 U.S.C. § 1962(d)**

24                      **(Against All Defendants)**

25      248.   Anthem repeats and realleges the allegations in Paragraphs 1 through 230

26  contained in this Complaint as if fully set forth at length herein.

27      249.   Section 1962(d) makes it unlawful for "any person to conspire to violate"

28  Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 56 –
COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

250.   The LaRoque Family and Sound Physicians Enterprises are each an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

251.   Defendants are employed by and/or associated with the LaRoque Family and Sound Physicians Enterprises, as applicable.

252.   The Defendants and the LaRoque Family and Sound Physicians Enterprises have knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the LaRoque Family and Sound Physicians Enterprises' affairs, as applicable, through a pattern of racketeering activity consisting of repeated violations of the wire fraud statute, 18 U.S.C. § 1343, based upon the use of interstate wire facilities to execute the profit-making fraudulent billing schemes described herein. The fraudulent disputes submitted to Anthem that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the Sections titled "The LaRoque Family Enterprise" and "The Sound Physicians Enterprise," *supra*.

253.   Defendants knew of, agreed to and acted in furtherance of the common overall objective (*i.e.*, to defraud Anthem and its affiliated health plans of money) by submitting or facilitating the submission of fraudulent ineligible and inflated disputes to Anthem through the IDR process.

254.   The LaRoque Family and Sound Physicians Enterprises' fraudulent conduct and participation in the racketeering activity described herein has directly and proximately caused Anthem and its affiliated health plans to incur several millions of dollars in damages.

255.   By reason of its injury, Anthem is entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

# COUNT III

# FRAUDULENT MISREPRESENTATION

## (Against All Defendants)

256.   Anthem repeats and realleges the allegations in Paragraphs 1 through 230 contained in this Complaint as if fully set forth at length herein.

257.   The Provider Defendants, and the HaloMD Defendants on behalf of and in coordination with the Provider Defendants, knowingly and willfully executed the schemes described herein with the intent to defraud Anthem by (1) submitting knowingly false attestations of IDR eligibility to Anthem, the IDREs, and the Departments and (2) falsely representing to Anthem that the disputes were eligible for IDR prior to initiating the IDR process, all done with the intent to obtain money owned or controlled by Anthem and its affiliated health plans under the false pretense that the disputes were eligible for resolution through the IDR process.

258.   For each of the IDRs initiated, the Provider Defendants, or the HaloMD Defendants on behalf of and in coordination with the Provider Defendants, submitted a completed version of the mandatory IDR notice of initiation to Anthem, the IDREs, and the Departments, which, in part, contained the following attestation:

> I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge…the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

259.   Yet as discussed herein, thousands of the Provider Defendants' and the HaloMD Defendants' attestations were clearly false, as the underlying services were not qualified items or services, and in fact, the disputes were ineligible for resolution through the NSA's IDR process.

260.   The Provider Defendants, or the HaloMD Defendants on behalf of and in coordination with the Provider Defendants, submitted the IDR notice of initiation in each such dispute with full knowledge of the falsity of this attestation. From the patient's insurance cards, the plain text of federal laws and regulations, CMS

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

COMPLAINT AND DEMAND FOR JURY TRIAL

publications and resources, the Provider Defendants' and/or the HaloMD Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that Anthem submitted to the Provider Defendants and to the HaloMD Defendants, among other sources, the Provider Defendants and the HaloMD Defendants knew that the services and disputes they were initiating were ineligible for the IDR process.

261. The Provider Defendants, and the HaloMD Defendants on behalf of and in coordination with the Provider Defendants, nevertheless submitted these false attestations and did so with the intent that Anthem and the IDRE rely on them. According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including the Provider Defendants' and the HaloMD Defendants' false attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). Even if Anthem contested eligibility, the Provider Defendants and the HaloMD Defendants knew and expected their deliberate misrepresentations would force Anthem to reasonably and foreseeably rely on the misrepresentations because once the IDRE determines the dispute is eligible, Anthem has no choice but to proceed with the process, submit a final offer, and allow the dispute the continue to a payment determination; any other approach would result in a default award against Anthem in favor of the Provider Defendants and the HaloMD Defendants for whatever outrageous amount they included in their final offer.

262. As described above, these misrepresentations were submitted by corporate agents using corporate email addresses—including nsa@halomd.com, soundnsa@halomd.com,          soundfedidr@soundphysicians.com,          and medsurantarbitrationnsa@halomd.com—which, upon information and belief, was an attempt to conceal the identity of the individuals submitting the false attestations. As parties to IDR have no ability to engage in discovery—in fact, the parties submit final offers and supporting evidence in a blind process without the right or ability to see the other party's submission—the submission of false attestations achieved the

concealment of the corporate actors filing the false attestations, save for DISP-2193991 where, on December 2, 2024, the HaloMD Defendant's employee "CJC" initiated IDR through the IDR portal using a false attestation of eligibility on behalf of and in coordination with N Express despite being on notice that the dispute was subject to California's State Surprise Billing Laws.

263.    Between January 4, 2024, and April 30, 2025, the Provider Defendants, and HaloMD on behalf of and in coordination with the Provider Defendants, submitted thousands of false attestations, including, for example, the disputes specifically referenced above.

264.    These false attestations of eligibility pertain to material facts in the IDR process because they go to the heart of the IDRE's jurisdiction to even hear the dispute.

265.    The Provider Defendants, and the HaloMD Defendants on behalf of and in coordination with the Provider Defendants, submitted the false attestations to receive a windfall for themselves, namely, IDR payment determinations in favor of the Provider Defendants and against Anthem regarding items or services that were ineligible for resolution through the IDR process.

266.    At all times when submitting the false attestations and engaging in the relevant IDR disputes, the HaloMD Defendants were acting within the scope of HaloMD's agreements with the Provider Defendants to handle the IDR process for the Provider Defendants in connection with the identified disputes.

267.    At all times when submitting the false attestations and engaging in the relevant IDR disputes, the HaloMD Defendants and the Provider Defendants were co-conspirators, each playing an integral role in carrying out the scheme, including providing funding, directing billing practices, and facilitating the submission of improper claims and IDR proceedings.

268.    The Provider Defendants, and the HaloMD Defendants on behalf of and in coordination with the Provider Defendants, also fraudulently misrepresented to Anthem during the statutorily required open negotiations process that the disputes were eligible

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

for IDR and involved qualified IDR items and services meeting the NSA and regulatory definitions of that term.

269.    Anthem reasonably, foreseeably, and justifiably relied on the Provider Defendants and the HaloMD Defendants' misrepresentations during the open negotiations and IDR initiation process. As part of the fraudulent scheme described herein, Defendants' tactic to strategically flood the IDR process and overwhelm the system precluded Anthem from investigating each and every aspect of the tens of thousands of disputes they submitted within the 30-day open negotiations window or within three days of IDR initiation, intending that Anthem would rely on Defendants' false representations of eligibility. Additionally, in some cases (such as when the patient waived balance billing protections), Defendants are the only entities in possession of information critical to Anthem's ability to assess a claim for IDR eligibility, such as information pertaining to the provider, types of services rendered, and patient records. Thus, Defendants knew Anthem was often incapable of knowing the falsity of Defendants' misrepresentations. As a result, Anthem justifiably relied on Defendants' misrepresentations that the disputes were eligible for IDR and incurred significant monetary losses through incurring fees required by the NSA and in the form of IDR payment determinations finding against Anthem.

270.    As a direct and proximate result of these misrepresentations by the Provider Defendants and the HaloMD Defendants on behalf of the Provider Defendants, Anthem and its affiliated plans have suffered substantial damages in the form of payment on IDR payment determinations that were ineligible for resolution through the NSA's IDR process.

## COUNT IV

## NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

271.    Anthem repeats and realleges the allegations in Paragraphs 1 through 230 contained in this Complaint as if fully set forth at length herein.

272.    In submitting the false attestations of eligibility, the Provider Defendants, and HaloMD on behalf of and in coordination with the Provider Defendants, misrepresented material facts to Anthem, the IDREs, and the Departments regarding eligibility of the disputes to proceed to the IDR payment determination stage. From the patient's insurance cards, the plain text of federal laws and regulations, CMS publications and resources, the Provider Defendants' and the HaloMD Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that Anthem submitted to the Provider Defendants and to the HaloMD Defendants, among other sources, the Provider Defendants and the HaloMD Defendants had no reasonable grounds on which to believe and represent that the services and disputes they were initiating were ineligible for the IDR process.

273.    As described above, these misrepresentations were submitted by corporate agents of the Provider Defendants and the HaloMD Defendants, using corporate email addresses—including         nsa@halomd.com,         soundnsa@halomd.com, soundfedidr@soundphysicians.com,    and    medsurantarbitrationnsa@halomd.com— which, upon information and belief, was an attempt to conceal the identity of the individuals submitting the false attestations. As parties to IDR have no ability to engage in discovery—in fact, the parties submit final offers and supporting evidence in a blind process without the right or ability to see the other party's submission—the submission of false attestations achieved the concealment of the corporate actors filing the false attestations, save for DISP-2193991 where, on December 2, 2024, the HaloMD Defendant's employee "CJC" initiated IDR through the IDR portal using a false attestation of eligibility on behalf of and in coordination with N Express despite being on notice that the dispute was subject to California's state specified law.

274.    The Provider Defendants and the HaloMD Defendants owed a duty of reasonable care to Anthem, under which they were required to conduct reasonable investigations, ensure the eligibility of the services for which they were initiating the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

IDR process, and guard against the submission of false attestations of eligibility leading IDREs to erroneously issue payment determinations in favor of the Provider Defendants and the HaloMD Defendants for items or services that were not eligible for the IDR process. The Provider Defendants and HaloMD Defendants owed Anthem a duty of care to submit accurate information to Anthem, the IDREs, and the Departments when they sought payment or additional payment on the medical claims underlying the IDR disputes. Specifically, in making the false representations to Anthem, the IDREs, and the Departments, the Provider Defendants and the HaloMD Defendants were acting in course of their business or profession and had a pecuniary interest in the underlying medical claims at issue. Moreover, the Provider Defendants and the HaloMD Defendants possessed superior knowledge of the facts underlying the services they (or their clients and co-conspirators in the case of the HaloMD Defendants) provide.

275.    The Provider Defendants, and the HaloMD Defendants on behalf of and in coordination with the Provider Defendants, submitted these false attestations with the intent that Anthem and the IDRE rely on them. Even if Anthem contested eligibility, the Provider Defendants' and the HaloMD Defendants' deliberate misrepresentation to the IDRE, on which the IDRE relied, forced Anthem to rely on the misrepresentation because, once the IDRE determines the dispute is eligible, Anthem has no choice but to proceed with the process, submit a final offer, and allow the dispute the continue to a payment determination; any other approach would result in a default award against Anthem and in favor of the Provider Defendant for whatever outrageous amount the Provider Defendant, or HaloMD acting on its behalf, included as the final offer.

276.    At all times when submitting the false attestations and engaging in the relevant IDR disputes, the HaloMD Defendants were acting within the scope of HaloMD's agreements with the Provider Defendants to handle the IDR process for the Provider Defendants in connection with the identified disputes.

277.    At all times when submitting the false attestations and engaging in the relevant IDR disputes, the HaloMD Defendants and the Provider Defendants were co-

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  conspirators, each playing an integral role in carrying out the scheme, including
2  providing funding, directing billing practices, and facilitating the submission of
3  improper claims and IDR proceedings.

4      278.   The Provider Defendants and/or HaloMD on behalf of and in coordination
5  with the Provider Defendants also falsely represented to Anthem during the statutorily
6  required open negotiations process that the disputes were eligible for IDR and involved
7  qualified IDR items and services meeting the NSA and regulatory definitions of that
8  term when, in fact, they did not.

9      279.   Anthem reasonably, foreseeably, and justifiably relied on the Provider
10  Defendants and the HaloMD Defendants' misrepresentations during the open
11  negotiations and IDR initiation process. As part of the fraudulent schemes described
12  herein, Defendants' tactic was to flood the IDR process and overwhelm the system such
13  that Anthem would be unable to investigate each and every aspect of the tens of
14  thousands of disputes often submitted on the same day within the 30-day open
15  negotiations window or within days after IDR initiation. Additionally, the HaloMD
16  Defendants and the Provider Defendants are in some circumstances the only entities in
17  possession of information critical to Anthem's ability to assess a claim for IDR
18  eligibility, such as information pertaining to the provider, types of services rendered,
19  and patient records. Thus, Defendants knew Anthem was often incapable of knowing
20  the falsity of Defendants' misrepresentations. As a result, Anthem justifiably relied on
21  the HaloMD Defendants' misrepresentations that the disputes were eligible for IDR and
22  incurred significant monetary losses through incurring fees required by the NSA and in
23  the form of IDR payment determinations finding against Anthem.

24      280.   As a direct and proximate result of the Provider Defendants' and the
25  HaloMD Defendants' misrepresentations, and Anthem's reasonable reliance on the
26  same, Anthem and its affiliated health plans have suffered substantial damages in the
27  form of payment on IDR payment determinations that were ineligible for resolution
28  through the NSA's IDR process.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 64 –
COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**COUNT V**

**BUSINESS ACTS OR PRACTICES IN VIOLATION OF**

**CAL. BUS. & PROF. CODE § 17200, *et seq.***

**(Against All Defendants)**

281.   Anthem repeats and realleges the allegations in Paragraphs 1 through 230 contained in this Complaint as if fully set forth at length herein.

282.   The Provider Defendants, and the HaloMD Defendants on behalf of and in coordination with the Provider Defendants, engaged in unlawful, unfair, and fraudulent business acts or practices by misrepresenting information to Anthem, the IDREs, and the Departments throughout the NSA dispute resolution process, including by submitting the false attestations of eligibility regarding the disputes. From January 4, 2024, to April 30, 2025, the Provider Defendants and/or the HaloMD Defendants on behalf of and in coordination with the Provider Defendants submitted thousands of ineligible disputes through the NSA dispute resolution process, including in the exemplar disputes identified above, in which they knowingly and willfully represented that the disputes were eligible through IDR when they knew they were not.

283.   From the patient's insurance cards, the plain text of federal laws and regulations, CMS publications and resources, the Provider Defendants' and the HaloMD Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that Anthem submitted to the Provider Defendants and to the HaloMD Defendants, among other sources, the Provider Defendants and the HaloMD Defendants knew that the services and disputes they were initiating were ineligible for the IDR process.

284.   The Provider Defendants and/or the HaloMD Defendants on behalf of the Provider Defendants, submitted these false attestations with the intent that Anthem and the IDRE rely on them.

285.   The actions of the Provider Defendants, and the HaloMD Defendants on behalf of the Provider Defendants, violated the following statutes:

- California Penal Code § 550, which makes it unlawful to knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim; conspire to or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact; or conspire to prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact, among other things.

- The Federal Health Care Fraud Statute, as set forth in 18 U.S.C. Section 1347, which prohibits individuals and entities from executing or attempting to execute a scheme to defraud a health care benefit program, whether or not it is a federal program.

286.    In addition to being unlawful, the conduct by the Provider Defendants, and the HaloMD Defendants on behalf of the Provider Defendants, described herein, is immoral, unethical, oppressive, and unscrupulous. Moreover, through the significant financial harm this conduct causes to Anthem and its affiliated plans, it also disrupts the insurance market and causes significant downstream harm to consumers through the increased cost of health care services.

287.    As a result of these unlawful, unfair, and fraudulent practices, Anthem and its affiliated health plans have suffered substantial damages.

## COUNT VI

## VACATUR OF NSA ARBITRATION AWARDS

### (Against All Defendants)

288.    Anthem repeats and realleges the allegations in Paragraphs 1 through 230 contained in this Complaint as if fully set forth at length herein.

COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

289.   Defendants improperly obtained arbitration awards under the NSA by misrepresenting that the services were qualified IDR items or services, warranting vacatur of such awards under 9 U.S.C. § 10(a) and 42 U.S.C. § 300gg-111(c)(5)(E).

290.   The IDR payment determinations at issue were procured by undue means and misrepresentation.

291.   For the IDR payment determinations at issue, the IDREs exceeded their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process.

292.   Defendants continue to obtain awards by undue means and misrepresentation. Thus, the list of IDR payment determinations subject to vacatur is expected to increase during the pendency of the case.

## COUNT VII

## ERISA CLAIM FOR EQUITABLE RELIEF

### (Against All Defendants)

293.   Anthem repeats and realleges the allegations in Paragraphs 1 through 230 contained in this Complaint as if fully set forth at length herein.

294.   Anthem provides claims administration services for certain health benefit plans governed by ERISA. Those health benefit plans and their employer sponsors delegate to Anthem discretionary authority to recover overpayments, including those resulting from fraud, waste, or abuse.

295.   ERISA authorizes a fiduciary of a health plan to bring a civil action to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

296.   Section 1185e of ERISA sets out the rights and obligations of plans and medical providers with respect to the IDR process, including that the IDR process does not apply in situations where there is a specified state law, where the provider is a

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COMPLAINT AND DEMAND FOR JURY TRIAL

participating provider, and where the provider has not initiated or engaged in open negotiations. 29 U.S.C. § 1185e.

297.    Through the acts described herein, Defendants have caused and continue to cause the overpayment of funds on behalf of ERISA-governed benefit plans through conduct that violates Section 1185e of ERISA.

298.    Defendants are continuing to engage in such improper conduct, including but not limited to failing to properly initiate or engage in open negotiations prior to initiating the IDR process, initiating IDR for services subject to California's specified state law, initiating IDR with respect to claims that Anthem denied and thus are exempt from the IDR process, and failing to comply with other NSA requirements such as the IDR batching rules or the cooling off period. This conduct causes ongoing harm to Anthem and the ERISA-governed benefit plans.

299.    There is an actual case and controversy between Anthem and Defendants relating to the claims fraudulently submitted and arbitrated as part of the NSA's IDR process.

300.    Anthem seeks an order enjoining Defendants from:

a.    Initiating IDR without first properly initiating and engaging in open negotiations;

b.    Initiating IDR for services subject to California's specified state law;

c.    Initiating IDR for services that Anthem denied and thus are not eligible for IDR; and

d.    Initiating IDR for services when Defendants failed to comply with other NSA requirements such as the deadline to initiate IDR following open negotiations.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COMPLAINT AND DEMAND FOR JURY TRIAL

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## COUNT VIII

## DECLARATORY AND INJUNCTIVE RELIEF

### (Against All Defendants)

301.    Anthem repeats and realleges the allegations in Paragraphs 1 through 230 contained in this Complaint as if fully set forth at length herein.

302.    Anthem seeks a declaration that Defendants' conduct in submitting false attestations and initiating IDR for unqualified IDR items or services is unlawful. Anthem additionally seeks a declaration that IDR awards for such unqualified IDR items or services are not binding. It further seeks an injunction prohibiting Defendants from continuing to submit false attestations and initiate IDR for items or services that are not qualified for IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for IDR.

303.    With respect to health plans and claims governed by ERISA, this cause of action is alleged in the alternative to the previous cause of action, in the event that the Court determines that relief under Section 1132(a)(3) of ERISA is not available.

304.    There is no adequate remedy at law to prevent the ongoing harm caused by Defendants' conduct.

### **PRAYER FOR RELIEF**

WHEREFORE, Anthem respectfully requests that the Court:

    a.  Award compensatory, punitive, and treble damages;

    b.  Enter an injunction prohibiting Defendants from submitting unqualified IDR items and services to IDR and otherwise initiating improper arbitrations;

    c.  Vacate all improperly obtained NSA arbitration awards;

    d.  Order the return of funds wrongfully obtained by Defendants;

    e.  Award costs, attorney's fees, and interest;

    f.  Declare that IDR awards issued on unqualified IDR items or services are non-binding and are not payable on a go-forward basis;

g.  Grant such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Anthem demands a trial by jury on all issues so triable.


DATED:  July 7, 2025


By: __/s/ *Amir Shlesinger*_____
     Amir Shlesinger

REED SMITH LLP
A limited liability partnership formed in the State of Delaware