Long X. Do (SBN 211439)
ATHENE LAW, LLP
5432 Geary Blvd. #200
San Francisco, California 94121
Telephone: (415) 686-7531
long@athenelaw.com

Eric D. Chan (SBN 253082)
ATHENE LAW, LLP
10866 Washington Blvd., #142
Culver City, California 90232
Telephone: (310) 913-4013
eric@athenelaw.com

*Attorneys for California Medical Association*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, a California corporation; BLUE CROSS OF CALIFORNIA DBA ANTHEM BLUE CROSS, a California corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>HALOMD, LLC; ALLA LAROQUE; SCOTT LAROQUE; MPOWERHEALTH PRACTICE MANAGEMENT, LLC; BRUIN NEUROPHYSIOLOGY, P.C.; NEUROLOGY, PC; N EXPRESS, PC; NORTH AMERICAN NEUROLOGICAL ASSOCIATES, PC; SOUND PHYSICIANS EMERGENCY MEDICINE OF SOUTHERN CALIFORNIA, P.C.; and SOUND PHYSICIANS ANESTHESIOLOGY OF CALIFORNIA, P.C.,<br><br>Defendants. | Case No. 25-cv-1467-KES<br><br>**AMICUS CURIAE BRIEF BY THE CALIFORNIA MEDICAL ASSOCIATION IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS AND SPECIAL MOTION TO STRIKE**<br><br>Judge:   Hon. Karen E. Scott |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

INTERESTS OF THE AMICUS CURIAE .......................................................... 1

DISCUSSION ...................................................................................................... 2

    A. THE NO SURPRISES ACT IS THE RESULT OF A CAREFULLY-BALANCED LEGISLATIVE COMPROMISE. .................................... 2

        1. Congress Restricted Balance Billing While Establishing an Open-Ended and Binding Independent Dispute Resolution Process. ............................................................................................... 2

        2. The NSA's IDR Process Is Designed to Select the Offer that Is More Reasonable. ..................................................................... 5

    B. THE IDR PROCESS HAS MOSTLY SERVED ITS INTENDED PURPOSE FOR BOTH PROVIDERS AND PAYORS. ............................ 7

        1. Providers Who Are Accessing the IDR Process Are Getting Disputes Resolved, Although Challenges Remain to Enforce IDR Awards. ...................................................................................... 7

        2. Setting Aside the IDR Process – as Anthem Wishes – Would Skew the Provider Marketplace to the Detriment of Access to Care. .............................................................................................. 9

CONCLUSION ................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of Air Med. Servs. v. U.S. HHS*,
  2023 WL 5094881 (D.D.C. Aug. 4, 2023) .......................................................... 2

*Guardian Flight, L.L.C. v. Health Care Serv. Corp.*,
  140 F.4th 271 (5th Cir. 2025) ............................................................................. 9

*Guardian Flight LLC v. Aetna Life Ins. Co.*,
  789 F. Supp. 3d 214 (D. Conn. 2025) ................................................................ 9

*Tex. Med. Ass'n v. U.S. HHS*,
  120 F.4th 494 (5th Cir. 2024) (*TMA III*), *vac'd and rehr'g granted by en banc* ................................................................................................... 2

*Tex. Med. Ass'n v. U.S. HHS*,
  2023 WL 5489028 (E.D. Tex., Aug. 24, 2023), *rev'd in part, aff'd in part*, 120 F.4th 494 ............................................................................. 2

*Tex. Med. Ass'n v. U.S. HHS*,
  587 F. Supp. 3d 528 (E.D. Tex. 2022) (*TMA I*) ............................................ 2, 7

*Tex. Med. Ass'n v. U.S. HHS*,
  654 F. Supp. 3d 575 (E.D. Tex. 2023), *aff'd* 110 F. 4th 762 (5th Cir. 2024) ......................................................................................................... 2

*Texas Med. Ass'n v. U.S. HHS*,
  110 F.4th 762 (5th Cir. 2024) (*TMA II*) ....................................................... 2, 7

**Statutes**

42 U.S.C. §300gg-111 ............................................................................................ *passim*

42 U.S.C. §300gg-131 ................................................................................................. 5

42 U.S.C. §300gg-132 ................................................................................................. 5

**Other Authorities**

CMS.gov, Independent Dispute Resolution Reports,
  https://www.cms.gov/nosurprises/policies-and-resources/reports ............. 8, 9, 10

*2024 Data: High Volume, More Provider Wins*, HEALTH AFFAIRS
  (June 11, 2025) ................................................................................................... 9

H.R. 2328, 116th Cong. §402, (2d Sess. 2020) .......................................................... 3

H.R. 3630, 116th Cong. ............................................................................................... 3

H.R. 5800, 116th Cong. §2 (2d Sess. 2020) .......................................................... 3, 4

H.R. 5800, 116th Cong. §4 (2d Sess. 2020) .......................................................... 3, 4

https://www.cms.gov/files/document/fact-sheet-clearing-independent-dispute-resolution-backlog.pdf ............................................................................. 8

https://www.elevancehealth.com/our-approach-to-health/consumer-centered-health-system/curbing-misuse-of-the-no-surprises-act ....................... 11

Joint Statement House Committees, "Protecting Patients from Surprise Medical Bills" (Dec. 21, 2020) ................................................................................. 4

Lower Health Care Costs Act (116th Cong., 1st Session, 2019-20) .......................... 3

STOP Surprise Billing Medical Bills Act of 2019 (116th Cong., 1st Session, 2019-20) .......................................................................................................... 3

# INTRODUCTION

In the No Surprises Act ("NSA"), Congress set forth a precise methodology for resolving disputes between insurers and healthcare providers over the price of out-of-network ("OON") medical services. *See* 42 U.S.C. §300gg-111(c). Keeping patients out of the middle of these disputes, the NSA requires insurers and providers to negotiate a resolution or go through a binding, baseball-style independent dispute resolution ("IDR") process. *Id.* at §300gg-111(c)(1)(A) and (B). So long as the IDR arbitrator considers certain factors, the NSA does not dictate or favor a particular result and leaves the IDR process entirely independent with the participants.

Such an open-ended IDR process is a prominent feature of the NSA that resulted from months of intense debate, advocacy, and bipartisan compromise. Despite the empirical evidence showing that the IDR process is largely working as Congress intended, plaintiffs Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California (collectively, "Anthem") have refused to accept the binding results of dozens of IDR cases. While the defendants' motions to dismiss (Dkt. 69, 73, 76) and special motion to strike under California's anti-SLAPP statute (Dkt. 78) articulate the reasons why Anthem's legal claims in this lawsuit must be dismissed, by this amicus curiae brief, the California Medical Association ("CMA") wishes to more broadly uncover Anthem's lawsuit as a thinly-veiled attempt to collaterally and broadly attack the IDR itself and thwart the NSA. This Court should not indulge Anthem's desire to revisit political questions that have been resolved in bipartisan, bicameral fashion.

## INTERESTS OF THE AMICUS CURIAE

CMA is a non-profit, incorporated professional physician association of over 45,000 members, who collectively practice medicine in all modes and specialties throughout California. CMA's primary purposes are "to promote the science and art

1

of medicine, the care and well-being of patients, the protection of public health, and the betterment of the medical profession."

CMA was directly involved in the legislative debates leading to the passage of the NSA. It also was part of coalitions that filed amicus curiae briefs in numerous cases discussing the purpose of the NSA, the IDR process, and the regulations that sought to implement the statute, including: *Texas Med. Ass'n v. U.S. HHS*, 110 F.4th 762 (5th Cir. 2024) (*TMA II*); *Tex. Med. Ass'n v. U.S. HHS*, 120 F.4th 494 (5th Cir. 2024) (*TMA III*), *vac'd and rehr'g granted by en banc*; *Tex. Med. Ass'n v. U.S. HHS*, 2023 WL 5489028 (E.D. Tex., Aug. 24, 2023), *rev'd in part, aff'd in part*, 120 F.4th 494; *Tex. Med. Ass'n v. U.S. HHS*, 654 F. Supp. 3d 575 (E.D. Tex. 2023), *aff'd* 110 F. 4th 762 (5th Cir. 2024); *Tex. Med. Ass'n v. U.S. HHS*, 587 F. Supp. 3d 528 (E.D. Tex. 2022) (*TMA I*); and *Ass'n of Air Med. Servs. v. U.S. HHS*, 2023 WL 5094881 (D.D.C. Aug. 4, 2023). CMA has a strong interest in ensuring that the NSA is enforced and interpreted in strict accordance with its statutory text. And CMA and its members have a strong interest in seeing the IDR process is fully realized as a means to resolving OON payment disputes.

## DISCUSSION

**A.  THE NO SURPRISES ACT IS THE RESULT OF A CAREFULLY-BALANCED LEGISLATIVE COMPROMISE.**

**1.  Congress Restricted Balance Billing While Establishing an Open-Ended and Binding Independent Dispute Resolution Process.**

In 2019-2020, as Congress tackled the challenge of protecting patients from surprise OON bills, it very carefully struck a balance that included an unbiased, workable and predictable process for health insurers and providers to resolve OON payment disputes. To understand the importance of the IDR process to the NSA, it is worth noting the alternatives that Congress explicitly rejected.

The legislative proposals around and leading up to the NSA differed on how to determine appropriate payment for OON services. The ultimately successful approach was to resolve disputes over payment through an <u>open-ended</u> dispute resolution process that would focus on the merits of a host of factors to determine the appropriate amount of payment. But a competing alternative was under consideration and supported by the health insurance industry.

In May 2019 a bipartisan group of senators proposed Senate bill S. 1531[1], which proposed a baseball-style IDR process determined by five factors. The bill attracted significant support, with thirty cosponsors in the Senate, and served as the framework for the NSA. However, the second competing approach was to establish a legislative "benchmark" payment rate to resolve out-of-network disputes. An early example was S. 1895.[2] It proposed a "benchmark for payment" that would be set at the payor's "median in-network rate" and would have given providers no ability to negotiate a different rate. The following month, H.R. 3630 was introduced and also proffered a benchmark approach.[3]

Subsequent proposals in 2020 moved closer towards a compromise but continued to diverge on the issue around rate-setting. The Consumer Protections Against Surprise Medical Bills Act of 2020 was introduced in February 2020, representing the persistence of the use of an open-ended IDR process.[4] In the same

---

[1] The STOP Surprise Billing Medical Bills Act of 2019 (116th Cong., 1st Session, 2019-20) [available online <u>here</u>].

[2] The Lower Health Care Costs Act (116th Cong., 1st Session, 2019-20) (sponsored by Senators Lamar Alexander (R-TN) and Patty Murray (D-WA)) [available online <u>here</u>].

[3] H.R. 3630 was also called "The No Surprises Act" [available online <u>here</u>]. Other proposals mandated payment of median in-network rates, unless those rates met a minimum threshold amount for the disputed service. *See* H.R. 5800, 116th Cong. §§ 2(a), 4(b) (2d Sess. 2020) ("Ban Surprise Billing Act") (allowing mediation where median in-network rate for disputed service was at least $750); H.R. 2328, 116th Cong. §§ 402(b), (2d Sess. 2020) ("No Surprises Act," as included in the "Reauthorizing and Extending America's Community Health Act") (allowing mediation where median contracted rate was at least $1250).

[4] Available online <u>here</u>.

month, the approach of resolving payment disputes through a legislative benchmark was reintroduced in H.R. 5800.[5]

After multiple proposals and advocacy by health insurers, Congress ultimately rejected the benchmark approach as it enacted the NSA with provisions for an IDR process. *See* 42 U.S.C. §300gg-111(a)(1)(C). As shown below, so long as the parameters and relevant factors were considered in the IDR, nothing in the NSA mandates a particular result, much less favors any particular amount to resolve OON disputes. These features of the IDR were integral in the bipartisan support of the NSA, not only with legislators but with stakeholder interests as well.

A bipartisan group of Congress lauded the NSA as a "free-market solution that takes patients out of the middle and fairly resolves disputes between plans and providers," while emphasizing that the NSA's "text includes **NO** benchmarking or rate-setting."[6] Equally important was the NSA's IDR process, which legislators emphasized was designed to "fairly decide[] an appropriate payment for services based on the facts and relevant data of each case."

The emphasis on the open-ended IDR process continued even after passage of the NSA. The then-Chair and Ranking Member of the House Ways & Means Committee issued a letter strenuously objecting to any regulatory effort to directly or indirectly establish a rebuttable presumption around any particular payment rate.[7] The letter emphasized that "[t]he law Congress enacted directs the arbiter to consider all of the factors without giving preference or priority to any one factor— that is the express result of substantial negotiation and deliberation among those Committees of jurisdiction and reflects Congress' intent to design an IDR process

---

[5] The Ban Surprise Billing Act, available online here.

[6] Joint Statement House Committees, "Protecting Patients from Surprise Medical Bills" (Dec. 21, 2020), available online here.

[7] Available online here.

4

that does not become a de facto benchmark."

Just this year, members of the House Ways and Means Committee issued a letter continuing to emphasize the important role of the open-ended IDR process. The Committee stressed the need to "implement the law in alignment with clear congressional intent" but lamented the fact that "multiple bipartisan concerns" have been raised that there was a "lack of timely payment following the [IDR] process," citing a survey that "indicated that 24 percent of settled disputes were not paid or were paid an incorrect amount."[8] Notably, the Committee did not raise concerns about provider abuse of the IDR process even though it highlighted its numerous efforts and hearings to investigate NSA implementation problems.

### 2. The NSA's IDR Process Is Designed to Select the Offer that Is More Reasonable.

The NSA takes patients out of the middle of OON billing disputes. *See* 42 U.S.C. §§300gg-131(a), 300gg-132(a). It also creates an IDR process whereby one or the other participant's offer is selected. 42 U.S.C. §300gg-111(c). Following initial payment[9] for services rendered, either side has 30 days to initiate a 30-day "open negotiations" period. *Id*. at §300gg-111(c)(1)(A). If the parties are unable to agree upon a rate of payment during that time, either side may initiate IDR. *Id*. at §300gg-111(c)(1)(B). The NSA then directs the parties to select a certified IDR Entity to resolve their dispute and "determine[] . . . the amount of payment" for the OON medical services in dispute. *Id.* at §300gg-111(c)(4)(F).

IDR under the NSA follows a "baseball-style" process in which the IDR Entity must pick, without modification, only from competing "offers" submitted by each side "to be the amount of payment for" the OON item or service in dispute. *Id*.

---

[8] *See* Ltr. to Sec'y R. F. Kennedy, Jr. et al. from Members of the House Ways and Means Committee (dated Sept. 5, 2025) [online here].

[9] The payor must make a timely "initial payment" to the rendering provider. 42 U.S.C. § 300gg-111(a)(1)(C)(iv); *id*. (b)(1)(C) and (b)(1)(D). But the NSA leaves that term undefined.

5

at §300gg-111(c)(5)(A). Each side may also submit "any information relating to such offer submitted by either party," which could include information by one party that an item or service under dispute is not eligible for IDR through the NSA. *Id*. at §300gg-111(c)(5)(B)(ii). In choosing among the submitted offers, the NSA specifies the considerations that the IDR Entity "shall" and "shall not" consider. *See id*. at §300gg-111(c)(5)(C) and (D).

The IDR Entity must consider all information submitted by the parties and cannot arbitrarily disregard a party's submission. *Id*. at §300gg-111(c)(5)(C)(i)(II). Factors that the IDR Entity must consider include: the "Qualifying Payment Amount" or "QPA," which is the median contracted rate for a specific health service in a given geographic area, used to set patient cost-sharing and by arbitrators in disputes, essentially acting as the "in-network" cost for out-of-network emergency care or services in in-network facilities, calculated from rates as of January 31, 2019, and adjusted annually for inflation (CPI-U). *Id*. at §300gg-111(a)(3) and (c)(5)(C)(i). In addition to the QPA, equally important and relevant are factors specific to the provider, including: "[t]he level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service"; "[t]he market share held by the nonparticipating provider . . . or that of the plan or issuer in the geographic region . . ."; "[t]he acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual"; "[t]he teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service"; and "[d]emonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider . . . or the plan . . . to enter into network agreements, and, if applicable, contracted rates between the provider . . . and the plan . . . during the previous 4 plan years." *Id*. at §300gg-111(c)(5)(C)(ii)(I)-(V).

The IDR Entity's decision "shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and . . . shall not be subject to judicial review." *Id.* at §300gg-111(c)(5)(E)(i).

Staying true to these clear statutory requirements, courts have struck provisions in the NSA implementing regulations that directly or indirectly elevated one factor over the other or in some way operated to establish any particular rate as a "benchmark." *See TMA II*, *infra*, 110 F. 4th at 776 (striking regulations that effectively elevate the QPA over other statutory factors that arbitrators must consider); *TMA I*, *supra*, 587 F. Supp. 3d at 528 (rejecting interim rule that sought to establish the QPA as a rebuttable presumption of the correct payment amount).

As the courts and Congressional members have made clear, the NSA's detailed requirements for the establishment of the IDR process is intended to serve as the binding mechanism for resolution of OON payment disputes. And it is equally clear under the NSA that the IDR process is to be open-ended, whereby only one of the competing offers is selected without modification. This is the compromise dispute resolution process that Congress designed in the NSA, and it is imperative that courts enforce Congress's intent underlying the IDR.

**B.  THE IDR PROCESS HAS MOSTLY SERVED ITS INTENDED PURPOSE FOR BOTH PROVIDERS AND PAYORS.**

**1.  Providers Who Are Accessing the IDR Process Are Getting Disputes Resolved, Although Challenges Remain to Enforce IDR Awards.**

The NSA's IDR process is largely working as Congress intended. Patients are protected from surprise billing, while disputes over OON payment are readily resolved without placing patients in the middle. The popularity of the IDR process thus represents a tremendous success, not some runaway failure as Anthem insinuates.

7

More IDR disputes than ever are being timely resolved. On September 19, 2025, the federal departments charged with implementing the NSA issued a "Fact Sheet: Clearing the Independent Dispute Resolution Backlog."[10] Despite a greater-than-anticipated volume of IDR cases, certified IDR Entities are deciding IDR cases more quickly, and the backlog of IDRs from previous years has nearly been cleared.[11] As of July 2025, 96.5% of all IDR disputes submitted since the beginning of the program have either been resolved or are less than 30 business days old. This is significant given that 30 business days (measured from the selection of an IDR Entity) "is the general target length of time for dispute resolution under the NSA."[12] CMS also reported increasing IDR resolution rates throughout much of 2025, with 2,546,134 total disputes closed between January 1, 2025 and November 30, 2025.[13]

At the same time, the volume of IDR disputes filed in calendar year 2025, though increased substantially from 2024, remained stable. According to CMS, the number of IDRs filed each month between April and November 2025 ranged from a low of 206,131 (in June) to a high of 243,784 (in October).[14] A total of 2,291,586 IDR proceedings were initiated between January 1 and November 30, 2025, or an average of 208,326 per month. The regulatory agencies thus plan to "continue to certify applicants to grow system capacity and [to] continue to enhance and modernize the IDR portal."[15] There is little risk of the system being overwhelmed.

---

[10] https://www.cms.gov/files/document/fact-sheet-clearing-independent-dispute-resolution-backlog.pdf.

[11] *Id.* at p. 3.

[12] *Id.*

[13] CMS.gov, Independent Dispute Resolution Reports, https://www.cms.gov/nosurprises/policies-and-resources/reports.

[14] *Id.*

[15] Fact Sheet: Clearing the Independent Dispute Resolution Backlog, supra, footnote 10.

Studies have also found that providers' offers are chosen over plans' offers in a great majority of the IDR cases. *See Jack Hoadley et al.*, *Independent Dispute Resolution Process 2024 Data: High Volume, More Provider Wins*, HEALTH AFFAIRS (June 11, 2025) [online here] (reporting providers' success rates between 83-88 percent in 2024). Given the design and "baseball arbitration" style of the IDR, the success rate suggests that plans are not trying as hard as providers to submit evidence to support their offers and, for the most part, providers' offers are the more reasonable as between the offers submitted. Despite their successes, as the Ways and Means Committee has found, providers have found it difficult to collect on favorable IDR awards. This has been made more difficult by a recent court decision holding there is no private right of action to enforce IDR awards, though there remains a split among courts. *See Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271, 277 (5th Cir. 2025); *but see Guardian Flight LLC v. Aetna Life Ins. Co.*, 789 F. Supp. 3d 214 (D. Conn. 2025).

### 2. Setting Aside the IDR Process – as Anthem Wishes – Would Skew the Provider Marketplace to the Detriment of Access to Care.

The relief sought by Anthem in this action, including, improbably – "[r]elief from all improperly-obtained NSA IDR awards" (Dkt. 50 [Amended Complaint] at "Prayer for Relief") – would upend the entire IDR framework. According to Anthem, <u>even where</u> IDR entities have done their job, performed an eligibility determination, and resolved the payment dispute in favor of one side or the other, any unfavorable IDR result is "improperly" obtained and must be overturned. As the defendants have pointed out, Anthem's allegations of fraudulent IDR filings is largely contrived or overblown, and it certainly is not a documented problem with the IDR process.

Anthem's problem is not with particular IDR case results but rather is with the statutory IDR process itself. (As an aside, Anthem is perfectly capable of

9

lobbying Congress to amend the No Surprises Act, and continues to do so.) Anthem is upset that it (like other payors) lose in the vast majority of IDR cases. The American Hospital Association recently pointed out that many of these IDR outcomes stem from Anthem's own failures to engage in the IDR process rather than any abuse by providers or inherent flaw in the system.[16] Federal data reflects that Anthem failed to participate in more than 30% of IDRs to which it was a party in 2024, resulting in default judgments for providers.[17] Anthem also does not consistently respond to providers during the open negotiations period that precedes IDR, forcing providers into the IDR process.[18]

By raising specious claims against IDR cases to support a broad injunction that effectively would deter if not negate providers' use of IDR, Anthem effectively seeks to throw a wrench in the entire process. In effect, Anthem wishes to eliminate the compromise that Congress enacted to address OON payment disputes, resetting the clock to the environment in which Anthem and other payors get to dictate the payment that providers must accept for OON services. In such a scenario, providers would be seriously harmed as payors could unilaterally pay well-below market prices as a means to forcing providers to accept extremely low contract rates.

Anthem is waging a campaign to gut the IDR process as it exists and as required under the NSA. It is lobbying for fundamental changes to the IDR claiming without substantiation that there is rampant provider abuse. The changes Anthem wishes to see are stark in revealing its true intent to get rid of the IDR process as envisioned by Congress:

---

[16] AHA December 17, 2025 Letter to Gail Boudreaux, President and Chief Executive Office, Elevance Health [online here].

[17] *Id.*

[18] *Id.*

- Requiring arbitrators to reject ineligible claims and justify unusually high awards.
- Suspending entities that repeatedly file excessive or high-volume disputes.
- Clarifying that planned or elective services at participating facilities are not eligible for IDR.
- Anchoring arbitration decisions to the QPA and requiring justification for any deviation.
- Modernizing the IDR portal to block ineligible or duplicative filings and cooling-off–period violations.
- Strengthening performance and transparency standards for IDR entities, including auditing outlier award patterns and requiring clearer written rationales.[19]

While courts have already rejected NSA regulations that would have realized some of these changes, such as provisions that elevated the QPA to the level of a benchmark or imposed burdens on arbitrators who choose the providers' offers, Anthem remains undeterred. An IDR process that conforms to Anthem's vision is not what Congress created and, indeed, is the sort of benchmark approach that Congress rejected over and over.

## CONCLUSION

For the foregoing reasons, CMA urges the Court to reject Anthem's efforts to alter the IDR process through specious RICO claims. Defendant's motions to

---

[19] https://www.elevancehealth.com/our-approach-to-health/consumer-centered-health-system/curbing-misuse-of-the-no-surprises-act.

dismiss and special motion to strike must be granted.

Dated: December 31, 2025          Respectfully submitted,

ATHENE LAW, LLP

By: _____/s/ Long X. Do_____
          LONG X. DO
*Attorneys for Amicus Curiae CALIFORNIA MEDICAL ASSOCIATION*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the California Medical Association, certifies that this brief contains 3,303 words, which is less than half the word limit of L.R. 11-6.1.

# FRAP 29 DISCLOSURE

Consistent with Federal Rule of Appellate Procedure, rule 29(a)(4)(E), the undersigned counsel for the California Medical Association represents that no party or party's counsel (i) authored this amicus brief in whole or in part; (ii) contributed money that was intended to fund preparing or submitting this brief; or (iii) contributed money that was intended to fund preparing or submitting the brief, other than the amicus curiae, its members, or its counsel.

Dated: December 31, 2025

*/s/ Long X. Do*
LONG X. DO
Attorney for Amicus Curiae
CALIFORNIA MEDICAL ASSOCIATION