# Exhibit A

TROUTMAN PEPPER LOCKE LLP
Jessamyn E. Vedro (SBN 280209)
jessamyn.vedro@troutman.com
350 South Grand Ave, Suite 3400
Los Angeles, CA  90071
Telephone:   213.928.9800
Facsimile:    213.928.9850

Ryan C. Temme (*pro hac vice* forthcoming)
Seth T. Perretta (*pro hac vice* forthcoming)
Elizabeth Loh (*pro hac vice* forthcoming)
**Groom Law Group, Chartered**
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel: (202) 867-0620
Fax: (202) 659-4503
sperretta@groom.com
rtemme@groom.com
eloh@groom.com

*Counsel for American Benefits Council, ERISA
Industry Committee & Business Group on
Health*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, a California corporation; and BLUE CROSS OF CALIFORNIA DBA ANTHEM BLUE CROSS, a California corporation, | Case No.: 8:25-cv-01467-KES |
| | Assigned to: Hon. Karen E. Scott |
| *Plaintiffs,* | **AMICUS CURIAE BRIEF BY THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, & THE BUSINESS GROUP ON HEALTH IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND SPECIAL MOTION TO STRIKE** |
| *vs.* | |
| HALOMD, LLC, et al., | |
| *Defendants.* | |

# **TABLE OF CONTENTS**

INTEREST OF THE AMICI CURIAE ........................................................................ 1

INTRODUCTION ....................................................................................................... 3

I.   CONGRESS ENACTED THE NSA TO PROTECT PATIENTS AND
     REIN IN OUT-OF-NETWORK COSTS. ........................................................... 3

II.  IDR DRIVES UP COSTS OF CARE FOR PLANS AND
     ENROLLEES. ....................................................................................................... 5

     A.   Continued Misuse of the IDR Process by Bad-Faith Actors
          Sharply Increases Costs for Employer Plans. ......................................... 6

     B.   Eligibility Disputes and Improper Filings Submitted by
          Intermediaries Burden Plans and Patients. ............................................. 8

     C.   The NSA Did Not Include a Mechanism to Deter Fraud and
          Misrepresentation. .................................................................................... 9

     D.   Fraudulent Use of the IDR Process Increases Plan Costs and
          Encourages Providers to Remain Out-of-Network. ............................... 12

III. CONCLUSION ................................................................................................... 13

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Statutes**

4

Affordable Care Act ...................................................................................... 11

5

6
Consolidated Appropriations Act, 2021, Pub. L. No. 116-220, 134 Stat.
    1182 (2020).......................................................................................... 2

7
ERISA ................................................................................................... 1, 11

8
No Surprises Act (NSA) .......................................................................*passim*

9

10
U.S. Code § 1185e(c)(1) ............................................................................... 6

11
U.S. Code § 1185e(c)(5)(F)(i) ...................................................................... 6

12

**Other Authorities**

13

166 Cong. Rec. H7301-02 ........................................................................... 4

14

15
Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980,
    56,066 (Oct. 7, 2021)............................................................................. 6

16

17
CMS, *Independent Dispute Resolution Reports,* Federal IDR
    Supplemental Tables for 2025,
    https://www.cms.gov/nosurprises/policies-and-resources/reports ...................... 3

18

19
CBO Estimate for Divisions O through FF of H.R. 133, Consolidated
    Appropriations Act, 2021 (Jan. 14, 2021),
    https://www.cbo.gov/system/files/2021-01/PL_116-260_div%20O-

20

21
    FF.pdf............................................................................................... 4, 5

22
H.R. Rep. No. 116-615, 53 (2020) .............................................................. 4

23
*HaloMD,* https://halomd.com/ (last visited February 1, 2026) .............................5

24
Jack Hoadley & Kennah Watts, *The Substantial Costs of the No
    Surprises Act Arbitration Process* (Sept. 24, 2025),
    https://chir.georgetown.edu/the-substantial-costs-of-the-no-

25

26
    surprises-act-arbitration-process/ ........................................................... 7

27

28

*New AHIP/BCBSA Survey Finds Providers are Flooding IDR System with Ineligible Disputes,* https://ahiporg-production.s3.amazonaws.com/documents/202510_AHIP_IB_No_Surprises_Act_Survey51.pdf (last visited Feb. 6, 2026)...................................10

Olena Mazurenko et al., *The Impact of Narrow and Tiered Networks on Costs, Access, Quality, and Patient Steering: A Systematic Review,* 79 Med. Care Rsch. & Rev., 607 (2021), *https://pmc.ncbi.nlm.nih.gov/articles/PMC9817087/* ........................................12

*Supplemental Background on Federal Independent Dispute Resolution Public Use Files, Jan. 1, 2025—June 30, 2025,* https://www.cms.gov/files/document/federal-idr-supplemental-background-2025-q1-2025-q2.pdf.........................................................6

Ukert B, Gordon AS, *Arbitration Outcomes for Out-of-Network Medical Bills Under the No Surprises Act,* https://pmc.ncbi.nlm.nih.gov/articles/PMC12698988/ (last visited Feb. 6, 2026)...................................................................12

## INTEREST OF THE AMICI CURIAE

The American Benefits Council ("Council") is a national non-profit organization dedicated to protecting and fostering privately sponsored employee benefit plans. Its approximately 440 members are primarily large, multistate employers that provide employee benefits to active and retired workers and their families. The Council's membership also includes organizations that provide employee-benefit services to employers of all sizes. The Council regularly participates as *amicus curiae* in cases affecting employee benefits.

The ERISA Industry Committee ("ERIC") is a national non-profit business trade association representing approximately 100 of the nation's largest employers in their capacity as sponsors of employee benefit plans for their workers, retirees, and families. ERIC member companies are leaders in every sector of the economy. ERIC remains the voice of large employer plan sponsors on public policies that affect their ability to provide benefits to millions of active workers, retired persons, and their families nationwide. ERIC frequently participates as *amicus curiae* in cases that have the potential for far-reaching effects on employee benefit plan design or administration.

Business Group on Health is the leading non-profit organization representing employers' perspectives on optimizing workforce strategy through innovative health, benefits, and well-being solutions and on health policy issues. The Business Group keeps its membership informed of leading-edge thinking and action on health care cost and delivery, financing, affordability and experience with the health care system. The Business Group's over 455 members include 74 Fortune 100 companies as well as large public sector employers, who collectively provide health and well-being programs for more than 60 million individuals in 200 countries. The Business Group regularly participates as *amicus curiae* in cases impacting employer health and welfare plans.

-1-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Amici's* members include thousands of employers that together offer or administer the health benefits of virtually all individuals covered under employer-sponsored plans.  As a result, *Amici* have a particular interest in the No Surprises Act ("NSA")[1] and its effects on the cost of providing health coverage.

Collectively, *Amici* have played an integral role in the development of a federal solution to the scourge of surprise balance bills.  In the adoption and implementation of the NSA, *Amici* have been strong advocates for patients and employers alike in protecting patients from ruinous medical costs while driving down the cost of health care generally.  *Amici* acknowledge and appreciate the NSA's success in protecting millions of patients from surprise balance bills.  However, *Amici* submit this brief to draw the Court's attention to impacts on plans and enrollees of the significant fraud and abuse that permeates the NSA's independent dispute resolution ("IDR") process.

---

[1] Consolidated Appropriations Act, 2021, Pub. L. No. 116-220, 134 Stat. 1182 (2020).

**INTRODUCTION**

The importance of this case transcends the interests of the parties.  The allegations of the Complaint illustrate a significant structural defect in the IDR process as applied to all balance billing disputes under the NSA.  That process tolerates and arguably encourages the kinds of fraud and abuse alleged here.  No subset of payers is more directly impacted than self-insured group health plans sponsored by private employers.[2]

The case before the Court represents an important challenge to the conduct of private third-parties in fraudulently manipulating a congressionally established dispute resolution process for their own financial gain.  The improper and excessive payments available through the IDR process impose massive costs on employer-sponsored health plans and their enrollees in the form of higher premiums, reductions in otherwise available benefits, or both.  The fraudulent behavior that Plaintiffs challenge here is widespread and impacts virtually all private payers of health care services.  These behaviors untenably increase the cost of health care for employers, employees, and the health care delivery system.  Payers must be able to utilize all available tools, including actions like the case before the Court, to protect their ability to offer high-quality, high-value health coverage to their enrollees.

**I.    CONGRESS ENACTED THE NSA TO PROTECT PATIENTS AND REIN IN OUT-OF-NETWORK COSTS.**

Prior to the NSA, health plan enrollees had no systematic way to avoid surprise medical bills involving air ambulance services, emergency services, and non-emergent services provided by out-of-network professionals at in-network facilities. The financial burden imposed by surprise bills on employees and their families was

---

[2] CMS, *Independent Dispute Resolution Reports,* Federal IDR Supplemental Tables for 2025, https://www.cms.gov/nosurprises/policies-and-resources/reports.

in many cases extraordinary.  After lengthy debate, Congress enacted the NSA to address these issues.

But, Congress had two goals when it adopted the NSA: to protect patients from surprise medical bills and to lower the cost of health care.  This is illustrated by the fact, that when scoring the budgetary impact of the NSA, the Congressional Budget Office ("CBO") determined that the dispute resolution process would generate $19 billion in budgetary savings and result in reductions of premium rates by 0.5 to 1 percent.[3]  A fact that Congressman Frank Pallone, a central negotiator of the NSA, noted in supporting the bill's patient protections and the fact that the anticipated savings permitted Congress to fund other important multi-year health policy goals.[4]

Congress made open negotiation the primary means of resolving payment disputes, with a dispute resolution process acting as a last resort when those negotiations fail.  In establishing the NSA's payment process, Congress understood the vital importance of provider networks in helping employers and other private payers deliver high value and cost-efficient health coverage to their employees.  The House Report accompanying the NSA explained that surprise medical billing arises from a "failure in the health care market, which causes providers—particularly in certain specialties—to have little or no incentive to contract to join a health plan's network."  The Report goes on to note that "[t]hese circumstances enable some providers to charge amounts for their services that exceed the marginal cost of producing those services," which can "result[] in compensation far above what is needed to sustain their practice".[5]

---

[3] *See CBO Estimate for Divisions O through FF of H.R. 133, Consolidated Appropriations Act, 2021* (Jan. 14, 2021), https://www.cbo.gov/system/files/2021-01/PL_116-260_div%20O-FF.pdf.

[4] 166 Cong. Rec. H7301-02, H7305.

[5] H.R. Rep. No. 116-615, 53 (2020).

That same report lauded "the opportunity to tether payment rates for surprise out-of-network bills directly to market-based prices, curbing cost growth relative to the status quo."[6]  To that end, the NSA included the qualifying payment amount ("QPA"), the plan's median in-network reimbursement rate, which serves two important purposes under the NSA.  First, it dictates the amount of cost-share that a provider can charge an individual for a service covered by the NSA, an amount that approximates the patient's cost-share for in-network providers.

Second, the QPA assists the IDR entity in evaluating competing offers submitted by the plan and the medical professionals and facilities (collectively "providers") as part of the IDR process.  Congress's focus on this payment amount was not accidental.  Rather, Congress attempted to ground payments in market rates by tethering the IDR process and the ultimate payment rate to the specific plan's median in-network rate.  To further that goal, Congress mandated that IDR entities consider the QPA in evaluating the parties' offers, a mandate that does not apply to any of the other factors that the IDR entity *may* consider.  The statute's reliance on the QPA reflects Congress' intent that market rates drive payment determinations.  When entities like HaloMD advertise themselves as achieving IDR awards of at least five times the QPA,[7] the use of the IDR process by bad-faith actors starkly undermines Congressional intent.

## II.    IDR DRIVES UP COSTS OF CARE FOR PLANS AND ENROLLEES.

While the NSA has protected millions of patients from surprise medical bills, the IDR process has sabotaged Congress' goal of reducing health costs and reinforcing provider networks.   The behavior of certain providers and their intermediaries, like Defendants, coupled with the perverse incentives for IDR entities

---

[6] *Id.* at 57.

[7] *See HaloMD,* https://halomd.com/ (last visited February 1, 2026) (touting $2 billion annual in IDR awards and awards of 5 times or more than the QPA).

to rule in favor of providers indisputably drives up the cost of health care. The existence of these incentives does not absolve providers and their representatives of the consequences of their bad-faith engagement with the IDR process.

> ### A.    Continued Misuse of the IDR Process by Bad-Faith Actors Sharply Increases Costs for Employer Plans.

Congress structured the NSA to protect individuals from surprise medical billing while channeling payment disputes into an open negotiation period of 30 days.[8] The IDR process was intended to operate as a narrow, backstop mechanism should those negotiations fail. While the Centers for Medicare and Medicaid Services ("CMS") estimated that the NSA would generate 17,000 disputes to be decided through IDR per year,[9] the reality today is starkly different. Initiating parties, virtually all of whom are providers (over 99%), initiated over 1.2 *million* disputes in the first half of 2025 alone.[10] Rather than a backstop, certain providers have turned the IDR process into a vehicle for filing high-volume, high-dollar claims to generate billions of dollars in plan and employer payments far exceeding the market-based pricing Congress intended. Fraudulent and abusive behavior by third-party intermediaries only exacerbates this issue driving up costs for employers and employees alike.

Under the rules established by Congress, the losing party in IDR must bear the full cost of the arbitration fee.[11] Given the outsized successes of providers in IDR (providers prevailed in 88% of IDR cases in the first half of 2025),[12] these arbitration

---

[8] 29 U.S. Code § 1185e(c)(1).

[9] Requirements Related to Surprise Billing; Part II; 86 Fed. Reg. 55,980, 56,066 (Oct. 7, 2021).

[10] *Supplemental Background on Federal Independent Dispute Resolution Public Use Files, Jan. 1, 2025—June 30, 2025*, https://www.cms.gov/files/document/federal-idr-supplemental-background-2025-q1-2025-q2.pdf.

[11] 29 U.S. Code § 1185e(c)(5)(F)(i).

[12] *Supra*, note 11.

fees fall predominately on the shoulders of payers, not providers.  Additionally, because arbitration fees are assessed on a claim-by-claim basis, there are no efficiencies gained with the high volume of filings we see today – just material and recurring additional costs.  As a result, employers not only incur significant internal administrative and vendor costs to respond to the volume of requests for IDR submitted, but also outsized fees associated with IDRs overwhelmingly selecting provider offers.

Neither Congress nor CMS anticipated this level of financial burden when the NSA was adopted and implemented.  These administrative burdens amount to billions of excess cost when scaled across the volume of claims submitted for IDR.[13]  Federal agencies estimated that plans' and providers' internal costs to submit IDR materials would be $857 per dispute.[14]  Based on that estimate, researchers at Georgetown University concluded that administrative costs reached roughly $1.9 billion from 2022 through 2024.[15]  Notably, these estimates do not fully capture other financial and administrative burdens associated with ongoing IDR participation, including vendor support and responses to procedural challenges.  *Amici's* members bear these expenses directly as necessary administrative expenses, but they do not contribute to high-value, high-quality health coverage for employees.

Even more concerning are the untenably exorbitant payment determinations selected by IDR entities which continue to drive payments far above market rates (and even in excess of the providers' original billed charges).  The prevailing offer was higher than the QPA in approximately 88% of payment determinations made in the

---

[13] Jack Hoadley & Kennah Watts, *The Substantial Costs of the No Surprises Act Arbitration Process* (Sept. 24, 2025), https://chir.georgetown.edu/the-substantial-costs-of-the-no-surprises-act-arbitration-process/.

[14] *Id.*

[15] *Id.*

first six months of 2025.[16]  The effect of prevailing rates so far in excess of the QPA creates untenable cost pressures for employers offering health coverage.  Specifically, for disputes resolved in 2023 and 2024, researchers estimate that IDR awards added $2.24 billion in payments to out-of-network providers.[17]

Taken together, this amounts to an additional $5 billion in administrative and claims expense has been added to the costs of health benefit plans.[18]  While employers continue to support the NSA in its goal of shielding patients from surprise medical billing, repeated abuse of the IDR process imposes unsustainable costs on employers and employees.

**B.    Eligibility Disputes and Improper Filings Submitted by Intermediaries Burden Plans and Patients.**

A substantial portion of IDR-related cost is attributable to bad-faith disputes over improperly submitted IDR-eligible claims.  The filing of such improper IDR claims is driven largely by the IDR entities' inability or unwillingness to reliably screen disputes for eligibility.  Notably, IDR entities have a significant financial incentive to proceed to a payment determination even with respect to ineligible claims, since they are only paid if they issue a payment determination.  Put differently, an IDR entity's dismissal of an ineligible claim results in $0 of fees/payments to the entity, even if it takes the entity significant time and effort to arrive at this conclusion.

Eligibility disputes consume significant resources and are common.  Eligibility challenges often focus on the fact that the claim at issue is not subject to the NSA in the first place, or the specific item or service is not covered by the health plan.  CMS

---

[16] *Supra*, note 11.

[17] *Id*.

[18] Hoadley & Watts, *supra*, note 14.

reporting shows that non-initiating parties challenged eligibility in a very large share of disputes. For instance, in the first half of 2025, non-initiating parties challenged eligibility approximately 40% of the time.[19] Each eligibility challenge requires the expenditure of time and resources by plans, significantly increasing plan costs with respect to that given claim.

C.     **The NSA Did Not Include a Mechanism to Deter Fraud and Misrepresentation.**

Congress made the now demonstrably false assumption that parties to the IDR would act in good faith by submitting only qualified IDR items and services to achieve market-based payment rates for out-of-network services. As a result, the NSA's structure does not itself create a functional anti-abuse regime for determining eligibility of a claim or generally monitoring the IDR process. While the federal government can enforce surprise billing prohibitions and administer the IDR portal, the NSA does not provide an operationally robust federal enforcement mechanism targeted to systematic IDR abuse by providers or intermediaries (e.g., mass submissions of ineligible disputes, mischaracterization of services to fit eligibility rules, strategic "refiling," or gamesmanship around batching). Nor does the judicial review available for parties to challenge the decision of the IDR entity protect against fraudulent schemes through which providers submit thousands of ineligible disputes. While the limits on judicial review of payment determinations seek to create efficiency and reliability of results, that mechanism only operates effectively under the weak assumption that IDR entities will rigorously evaluate both eligibility and the parties' offers. In practice, however, the statute and implementing regulations have left employer-sponsored health plans with limited opportunity to police eligibility without bearing the expense of litigation. The result is that employers and plans must

---

[19] *See supra* note 11.

rely on case-by-case challenges inside a system that incentivizes IDR entities to find eligibility and issue payment determinations favoring initiating parties.

The available data confirms this is the case.  Where an employer spends the time and resources to have an IDR entity properly exclude an ineligible claim, the odds of success are small.  A 2025 survey of plans reports that plans identified as much as 39% of disputes as ineligible in 2024; with the stated reasons including improper jurisdiction (subject to state law, not federal law), duplication/refiling, claims for in-network providers, or claims paid by Medicaid or Medicare.[20]  Yet IDR entities dismissed only 17% of cases as ineligible in the first half of 2025.[21]  And so inadequate eligibility screening represents a major cost driver as ineligible claims result overwhelmingly in awards for providers.

These incentives lead not only to system-wide inefficiencies , but also result in clear instances where IDR entities disregard the data presented and rigidly select the provider payment amount.  For example, in a single IDR case, a provider disputed payment for 98 identical service codes, and submitted offers of $1,024 on all but one of the submissions.[22]    On the final submission, the provider's offer was $11,024,024.00, a clear typographical error.  Notwithstanding the error, and the absurdity of the more than $11 million payment request, the IDR entity ruled in favor of the provider on *all* the offers including the submission of a 1,765,000 percent markup as compared to the provider's other offers for exactly the same service.  While the plan in that case submitted a request for review of the IDR entity's determination within days of receiving the decision, the IDR entity never responded.  At best,

---

[20] *New AHIP/BCBSA Survey Finds Providers are Flooding IDR System with Ineligible Disputes,* https://ahiporg-production.s3.amazonaws.com/documents/202510_AHIP_IB_No_ Surprises_Act_Survey51.pdf (last visited Feb. 6, 2026).

[21] *Supra*, note 11.

[22] Temme Decl. ¶ 5, Feb. 6, 2026.

examples of this type demonstrate a complete lack of rigor in IDR entities actually reviewing the parties' offers, let alone the underlying materials, and at worst reflect a desire by IDR entities to rule in favor or providers regardless of the facts in order to protect their revenue stream and promote their financial success. With certain IDR entities ruling for providers as much as 99 percent of the time, the latter motivation must not be discounted.[23]

While these structural issues with the IDR process are not before the Court, provider intermediaries and other entities that have developed business models intended to exploit that structure are. The concentration of IDR submissions among a very small number of initiating parties, with the top three initiating parties (HaloMD, Team Health, and SCP Health) accounting for approximately 44% of all disputes initiated in the first six months of 2025 makes clear.[24]

Notably, provider intermediaries, like Defendant HaloMD, are alone as unregulated entities in the health care delivery system. Clinical providers are licensed at the state level, and subject to a host of fraud, waste, and abuse rules at the federal level. Insurers are subject to copious state and federal regulation, and self-insured plans and their service providers are subject to both substantive benefit requirements and fiduciary obligations under ERISA and the Affordable Care Act. Provider intermediaries face no such regulation, let alone one that would govern their conduct with respect to the IDR process. This lack of regulation does not, however, create an inference that they can act with impunity for behavior that amounts to federal or state civil fraud. To the contrary, the lack of regulation heightens the need for the courts to hold them accountable for the significant damage they cause to employers and employees by manipulating the IDR process.

---

[23] *See* Hoadley & Watts, *supra*, note 14.

[24] *Supra*, note 11.

**D.    Fraudulent Use of the IDR Process Increases Plan Costs and Encourages Providers to Remain Out-of-Network.**

Courts must allow health plans to use applicable state and federal laws to challenge a party's conduct where the facts show fraudulent or otherwise abusive behavior in the IDR process.  The consequences of finding to the contrary would frustrate Congress' intent in passing the NSA, and have significant adverse long-term effects for our health care delivery model – including the erosion of robust provider networks which employers rely on to deliver higher quality, coordinated care.[25]

Fraudulent use of the IDR process creates significant incentives for providers to leave, or otherwise remain out of, plan networks.  When IDR awards exceed in-network payment rates (as represented by the QPA), the system over-compensates out-of-network care across specialties.  One study determined that in 2023 median awards were 372% of the QPA.[26]  This dynamic has persisted with median payment determinations in 2024 equaling 445% of the QPA.[27]  Of particular relevance here, in disputes filed by HaloMD, the median award amount was 934% of the QPA.[28]

These examples are not isolated.  Recent CMS data makes clear that, in provider-won outcomes, prevailing offers can substantially exceed the plan's QPA.  For instance, for items and services under $100, the median prevailing offer relative to the QPA was 591% in the first half of 2025.[29]  The same CMS data also show the

---

[25] Olena Mazurenko et al., *The Impact of Narrow and Tiered Networks on Costs, Access, Quality, and Patient Steering: A Systematic Review*, 79 Med. Care Rsch. & Rev., 607 (2021), *https://pmc.ncbi.nlm.nih.gov/articles/PMC9817087/*.

[26] Ukert B, Gordon AS. *Arbitration Outcomes for Out-of-Network Medical Bills Under the No Surprises Act*, https://pmc.ncbi.nlm.nih.gov/articles/PMC12698988/ (last visited Feb. 6, 2026).

[27] *See* Hoadley & Watts, *supra*, note 14.

[28] *Id.*

[29] *See supra*, note 11.

median prevailing offer as a percent of the QPA for neurology and neuromuscular procedures equaling 2862% of the QPA – with these claims totaling 52,641 in the second quarter of 2025 alone this is not a statistical anomaly, but a business model. Taken together, if these abusive and fraudulent behaviors are left unchecked, the Court should expect the long-term erosion of provider networks and drastically increased plan and premium costs for employers and patients alike.

## III.    CONCLUSION

As *Amici*'s members and the hundreds of millions of Americans who receive health coverage from them continue to face the challenges of ever-rising health care costs, the negative influences of a small subset of bad actors must not go unchecked. The inflationary effects of the fraud and abuse alleged by Plaintiffs are common across all payers subject to the NSA, most acutely employer-sponsored plans.  This court should recognize that the lack of regulation of intermediaries like HaloMD under federal or state health regulatory structures does not give them a free pass to extract massive financial windfalls from a currently dysfunctional IDR process though fraudulent or otherwise improper behavior.

Dated: February 6, 2026                    Respectfully submitted,
                                           */s/ Ryan C. Temme*
                                           Ryan C. Temme(*pro hac vice*
                                           forthcoming)
                                           Seth T. Perretta (*pro hac vice*
                                           forthcoming)
                                           Elizabeth Loh (*pro hac vice*
                                           forthcoming)
                                           *Counsel for Amici Curiae*

1

Dated:          February 6, 2026                    TROUTMAN PEPPER LOCKE LLP

2

3

By:  */s/  Jessamyn E. Vedro*

4

Jessamyn E. Vedro

5

*Counsel for American Benefits Council, ERISA Industry Committee*

6

*& Business Group on Health*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN PEPPER LOCKE LLP
Jessamyn E. Vedro (SBN 280209)
jessamyn.vedro@troutman.com
350 South Grand Ave, Suite 3400
Los Angeles, CA 90071
Telephone: 213.928.9800
Facsimile: 213.928.9850


Ryan C. Temme (*pro hac vice* forthcoming)
Seth T. Perretta (*pro hac vice* forthcoming)
Elizabeth Loh (*pro hac vice* forthcoming)
**Groom Law Group, Chartered**
1701 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Tel: (202) 867-0620
Fax: (202) 659-4503
sperretta@groom.com
rtemme@groom.com
eloh@groom.com

*Counsel for American Benefits Council, ERISA
Industry Committee & Business Group on
Health*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, a California corporation; and BLUE CROSS OF CALIFORNIA DBA ANTHEM BLUE CROSS, a California corporation, | Case No.: 8:25-cv-01467-KES<br><br>Assigned to: Hon. Karen E. Scott<br><br>**DECLARATION OF RYAN C. TEMME IN SUPPORT OF BRIEF OF AMICI CURIAE** |
| Plaintiffs, | |
| vs. | |
| HALOMD, LLC, et al., | |
| Defendants. | |

Pursuant to section 1746 of Title 28 of the United States Code, I, Ryan C. Temme, declare the following:

1.    I am over the age of 18, and I am otherwise fully competent to testify to the matters stated in this Declaration.

2.    I am a Principal at Groom Law Group, Chartered in Washington, DC.

3.    I represent Amici Curiae The American Benefits Council, the ERISA Industry Committee, and the Business Group on Health ("Amici Curiae") in the above-captioned matter.

4.    I make this Declaration in support of the Brief of Amici Curiae that is in opposition to Defendants' Motions to Dismiss and Special Motion to Strike.

5.    Attached as **Exhibit A** is a redacted copy of a summary of one Amici member's experience with the federal independent dispute resolution process.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      February 6, 2026

_/s/  Ryan C. Temme_____
Ryan C. Temme

# Exhibit A

# NSA IDR case examples

| Dispute # | IDRE | Claim # | Total Billed | ■■ Offer | Provider Offer | Prevailing Rate | Comment |
|---|---|---|---|---|---|---|---|
| DISP-■■ | C2C Innovative Solutions, Inc. | ■■■■ | $6,965.00 | $593.71 | $66,965.00 | $66,965.00 | Case was ruled in favor of the provider for $66,965.00 for this Service Code. It appears the Provider's OFFER amount was a typo by the provider on the submission, intending to submit the charged amount as the offer, however, it demonstrates that the offer amount is not being considered by the IDRE when reaching a determination. |
| DISP-■■ | C2C Innovative Solutions, Inc. | ■■■■ | $9,000.00 | $424.08 | $90,000.00 | $90,000.00 | Case was ruled in favor of the provider for $90,000.00 for this Service Code. It appears the Provider's OFFER amount was a typo by the provider on the submission, intending to submit the charged amount as the offer, however, it demonstrates that the offer amount is not being considered by the IDRE when reaching a determination. |
| DISP-■■ | EdiPhy Advisors, L.L.C. | ■■■■ | $1,968.00 | $423.09 | $1,933,664.00 | $1,933,664.00 | Case was ruled in favor of the provider for nearly $1,933,664.00 for this Service Code. This demonstrates that the offer amounts are not being considered by the IDRE when reaching a determination. |
| DISP-■■ | Maximus Federal Services, Inc. | Multi-claim submission with all consisting of the same Service Code – specifically for claim #■■■■ | $1,926.00 | $278.68 | $11,292,292.00 | $11,292,292.00 | One line of this 16-line submission was submitted with an offer of $11,292,292 by the provider and ruled in favor of the provider while all other offers in the case submitted by the provider were for $1,292.00. This demonstrates that the offer amounts are not being considered by the IDRE when reaching a determination, specifically with a multiple-claim, same Service Code. |
| DISP-■■ | MCMC Services, LLC | multi-claim submission with all consisting of the same Service Code - specifically for claim #■■■■ | $1,386.00 | $188.93 | $11,024,024.00 | $11,024,024.00 (Determination #44) | 98-line case submission was submitted with one line's offer being $11,024,024.00 by the provider and ruled in favor of the provider, with all other offers in the case for the same Service Code was at $1,024.00. An error review request was submitted to the IDRE on 7/3/25, with a follow-up on 7/28/25, requesting a review if there was a typo made in the IDR determination. No response was received from the IDRE on the error review request. |
| DISP-■■ | Federal Hearings and Appeals Services, Inc. | ■■■■ | $34,272.00 | $1,152.69 | $166,252.80 | $166,252.80 | Charge on the service code was only $34,272.00, yet the Provider offer was $166,252.80 and ruled in favor of the provider. Also noting this claim was for a fully insured plan with services rendered in New York, meaning the claim was processed and covered by NY surprise billing law. The IDRE was advised of the state law applicability in the brief ■■ submitted on the case. This demonstrates that not only are the ineligible objections ignored by the IDRE, but that the original billed amount and the offer amounts are not being considered by the IDRE when reaching a determination. |