O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, et al.,<br><br>      Plaintiffs,<br><br>  v.<br><br>HALOMD LLC, et al.,<br><br>      Defendants. | Case No. 8:25-cv-01467-KES<br><br>MEMORANDUM OPINION AND ORDER |

**I.**

**INTRODUCTION**

In July 2025, Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California d/b/a Anthem Blue Cross ("Plaintiffs" or "Anthem") filed this civil lawsuit. (Dkt. 1.) The operative First Amended Complaint ("FAC" at Dkt. 50) names the following Defendants:

(1) HaloMD, LLC ("HaloMD") and its president, Alla LaRoque (collectively, the "HaloMD Defendants");

(2) MPOWERHealth Practice Management, LLC and its CEO, Scott LaRoque (collectively, the "MPOWERHealth Defendants");

(3) Bruin Neurophysiology, P.C.; iNeurology, PC; N Express, PC; and

1

North American Neurological Associates, PC (collectively, the "LaRoque Family Providers");

(4) Sound Physicians Emergency Medicine of Southern California, P.C. and Sound Physicians Anesthesiology of California, P.C. (collectively, the "Sound Physicians Providers").

(FAC at 2.)

Plaintiffs' claims arise out of the mandatory, independent dispute resolution ("IDR") process to resolve certain types of billing disputes between health plans and out-of-network providers established by the federal No Suprises Act ("NSA"). The FAC provides this overview of the NSA's IDR process:

> [T]he NSA created a separate framework outside the judicial process for health plans and providers to resolve specific types of eligible surprise billing disputes. See 42 U.S.C. § 300gg-111(c). The framework consists of (1) open negotiations—a required 30-business-day period to try resolving the dispute informally; (2) an IDR process for "qualified IDR items and services" if no agreement is reached; and (3) if applicable, a payment determination from private parties called certified IDR entities ("IDREs").

(FAC at 12, ¶ 43.)

Most of the Defendants are healthcare providers. HaloMD "initiates and administers IDR proceedings on behalf of healthcare providers" like the other Defendants. (Id. at 4, ¶ 6.)

The FAC asserts the following federal claims:

Count One: Violations of the Racketeering Influenced and Corruption Organizations Act ("RICO"), 18 U.S.C. § 1962(d), against the LaRoque Family Providers, the HaloMD Defendants, and the MPOWERHealth Defendants (alleged to be the "LaRoque Family Enterprise"), based on allegations that these Defendants engaged in mail and wire fraud, or conspired in such fraud, by submitting billing disputes to the IDR process that they knew were ineligible, accompanied by false attestations of eligibility. (Id. at 3, ¶ 3; id. at 24, ¶ 93.)

2

Count Two: Similar violations of RICO, 18 U.S.C. § 1962(d), against the Sound Physicians Providers and HaloMD (alleged to be the "Sound Physicians Enterprise").

Count Three: Similar violations of RICO, 18 U.S.C. § 1962(c), against the LaRoque Family Enterprise.

Count Four: Similar violations of RICO, 18 U.S.C. § 1962(c), against the Sound Physicians Enterprise.

Count Eleven: Vacatur of IDR determinations under the NSA, 42 U.S.C. § 300gg-111(c)(5)(E), against all Defendants.

Count Twelve: Equitable relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3).

Count Thirteen: Declaratory and injunctive relief.

The FAC asserts the following state law claims:

Count Five: Fraudulent misrepresentation against all members of the LaRoque Family Enterprise.

Count Six: Fraudulent misrepresentation against all members of the Sound Physicians Enterprise.

Count Seven: Negligent misrepresentation against all members of the LaRoque Family Enterprise.

Count Eight: Negligent misrepresentation against all members of the Sound Physicians Enterprise.

Count Nine: Violations of the Unfair Competition Law ("UCL") at California Business & Professions Code §§ 17200 et seq. against all members of the LaRoque Family Enterprise.

Count Ten: Violations of the UCL against all members of the Sound Physicians Enterprise.

Defendants responded to the FAC by filing the following motions:

/ / /

3

| Dkt. | Motion | Movants | Briefs[1] |
|---|---|---|---|
| 69 | Motion to Dismiss FRCP 12(b)(1) & (6) | Sound Physicians Providers | Oppo: 93 Reply: 117 |
| 72 | Motion to Dismiss FRCP 12(b)(2) | MPOWERHealth Practice Management, LLC | Oppo: 93 Reply: 123 |
| 73 | Motion to Dismiss FRCP 12(b)(6) | MPOWERHealth Practice Management, LLC and LaRoque Family Providers | Oppo: 93 Reply: 124 |
| 76 | Motion to Dismiss FRCP 12(b)(1), (2) & (6) | HaloMD | Oppo: 93 Reply: 120 |
| 77 | Motion to Dismiss FRCP 12(b)(1), (2) & (6) | Alla & Scott Laroque | Oppo: 93 Reply: 121 |
| 68 | Special Motion to Strike (Anti-SLAPP) | Sound Physicians Providers | Oppo: 92 Reply: 118 |
| 78 | Special Motion to Strike (Anti-SLAPP) | HaloMD Defendants | Oppo: 92 Reply: 122 |
| 74 | Joinder in Dkt. 68 & 78 | MPOWERHealth Practice Management, LLC and LaRoque Family Providers | See above |

On March 10, 2026, the Court held oral argument.  (Dkt. 127 (minutes); Dkt. 132 (hearing transcript); Dkt. 134 (presentation decks).)  For reasons explained in detail below, the Court:

(1) GRANTS, without leave to amend, the motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) challenging Count Eleven for vacatur (Dkt. 69, 73, 76, 77), because the facts alleged in the FAC establish no authorized basis for the district court to vacate any IDR determinations;

(2) GRANTS, without leave to amend, the motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(1) asserting lack of subject matter jurisdiction over the remaining federal claims (Dkt. 69, 76, 77)

---

[1] In addition to the briefs listed in the chart, the Court reviewed amicus briefs filed at Dkt. 80-1, 99, and 101.

because, aside from vacatur authorized by 42 U.S.C. § 300gg111(c)(5)(E)(i)(II), the NSA precludes judicial review of IDR determinations, regardless of the legal theory under which judicial review is sought;

(3) DECLINES to exercise supplemental jurisdiction over the FAC's state law claims and DISMISSES them without prejudice (see 28 U.S.C. § 1367(c)); and

(4) DENIES, without prejudice, the anti-SLAPP motions to strike the state law claims (Dkt. 68, 74, 78) as moot because the Court dismissed the state law claims rather than exercising supplemental jurisdiction.

**II.**

**SUMMARY OF THE FAC'S FACTUAL ALLEGATIONS**

**A. The NSA's IDR Process.**

"Effective January 1, 2022, the NSA banned surprise billing for three categories of out-of-network care: (1) emergency services; (2) non-emergency services at in-network facilities; and (3) air ambulance services. See 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135." (FAC at 12, ¶ 42.) When a health plan like Anthem receives a claim for out-of-network services subject to the NSA …, the health plan is supposed to make "an initial payment or issue a notice of denial of payment within 30 days. See 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I)." (Id. ¶ 44.)

"If the provider is dissatisfied with the initial payment, then the provider or its designee may initiate open negotiations with the health plan by providing formal written notice to the health plan within 30 business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A)." (Id. ¶ 45.) "After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan over the 30-business-day open negotiations period." (Id. at 12-13, ¶ 45.) "If the provider initiates and exhausts the 30-day open negotiations period, and 'the open negotiations … do not result in a determination

of an amount of payment for [the] item or service,' then the provider may initiate the IDR process.  See 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i)."  (Id. at 13, ¶ 46.)  Providers must initiate the IDR process within four business days after exhausting the open negotiations period.  (Id.)

"When initiating the IDR process, providers must, among other things, submit an attestation that the items and services in dispute are qualified IDR items or services within the scope of the IDR process."  (Id. at 15, ¶ 53.)  To be qualified, the following conditions must be met:

a. The underlying services are within the NSA's scope, meaning they are out-of-network emergency services, non-emergency services at participating facilities, or air ambulance services;

b. The services involve a patient with healthcare coverage through a group plan or health insurer subject to the NSA (e.g., not coverage through government programs like Medicare or Medicaid);

c. A state surprise billing law (referred to as a "specified state law" in the NSA) does not apply to the dispute;

d. The underlying services were covered by the patient's health benefit plan (i.e., payment was not denied);

e. The patient did not waive the NSA's balance billing protections;

f. The provider initiated and exhausted open negotiations;

g. The provider initiated the IDR process within 4 business days after the open negotiations period was exhausted; and

h. The provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days.

(Id. at 13-14, ¶ 48 (citing 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2)).)

Providers initiating the IDR process must do so "online through a federal

'IDR Portal.'" (Id. at 16, ¶ 54.) The initiating party must agree to certain terms and conditions, including a notice that they will need to submit an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process." (Id. ¶ 58.) "After agreeing to the terms and conditions, initiating parties must answer certain 'Qualification Questions' through an online form. If the answers to the Qualification Questions indicate that the dispute is not eligible for IDR, the form will provide an alert and prevent the initiating party from proceeding." (Id. at 17, ¶ 59.) "After successfully completing the Qualification Questions, the initiating party is asked to complete the Notice of IDR Initiation Form," which requires inputting "a variety of relevant information." (Id. at 18, ¶ 63.) At the end of this process, the initiating party must attest, via electronic signature, that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process." (Id. ¶ 64.)

A copy of the Notice of IDR Initiation is sent electronically to "the non-initiating party (i.e., the health plan), the IDRE, and the Departments."[2] (Id. ¶ 65.) "[T]he parties select, or HHS appoints, an IDRE. 42 U.S.C. § 300gg-111(c)(4)(F)." (Id. at 19-20, ¶ 72.) The IDRE is directed by regulation to "'determine whether the Federal IDR process applies.' 45 C.F.R. § 149.510(c)(1)(v)." (Id. at 20, ¶ 73.) Guidance published by the government agencies that oversee the IDR process instruct non-initiating parties who believe that the IDR process does not apply how to submit relevant information through the portal. (Dkt. 76-5 at 18, § 5.5.[3]) The

____

[2] The FAC defines the "Departments" as the Department of Health and Human Services ("HSS"), the Department of Labor, and the Department of the Treasury. (FAC at 15 n.9.) The Centers for Medicare & Medicaid Services ("CMS") is the federal agency within HSS primarily charged with implementing the IDR process. (Id. ¶ 52.)

[3] The Court GRANTS the request for judicial notice (Dkt. 76-2) and considers the guidance documents as a factual description of how the IDR process is supposed to work, not as evidence of how it actually worked for any particular

IDRE "must determine whether the Federal IDR Process is applicable." (Id.) IDREs can and do reject some disputes as ineligible for IDR. (FAC at 22, ¶ 80 (citing 42 U.S.C. § 300gg-111(c)(5)(F)).)

"[I]f the IDRE determines the IDR process applies, then the IDRE proceeds to a payment determination. 42 U.S.C. § 300gg-111(c)(5)(A)." (Id. at 20, ¶ 74.) "IDR payment determinations resemble a baseball-style dispute resolution where the provider and health plan each submit an offer, and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B)." (Id. ¶ 75.) "An IDR determination for a 'qualified IDR item or service' is 'binding' unless there was 'a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim[.]' 42 U.S.C. § 300gg-111(c)(5)(E)(i)." (Id. at 21, ¶ 77.) There is, however, a "process for reopening disputes to correct errors" and rescind payment determinations, including errors in eligibility determinations. (Dkt. 76-8 at 2, 4.) Additionally, the government can revoke an IDRE's certification for submitting false data or exhibiting a "pattern or practice of noncompliance" with the applicable requirements. (Dkt. 76-6 at 37, § 12.)

"Parties to IDR proceedings are responsible for payment of two fees. First, both parties must pay a non-refundable administrative fee—currently $115—when the dispute is initiated. This fee is not recoverable even when the IDRE determines that the dispute does not qualify for IDR, or even when the initiating party later voluntarily withdraws the dispute. Second, both parties must pay an IDRE fee before the IDRE makes the payment determination. The IDRE fee is set by the specific IDRE and depends on the type of IDR submitted, but ranges from $200 to $1,173." (FAC at 21, ¶ 79.) The non-prevailing party is responsible for paying both its administrative fee and the whole IDRE fee. (Id. at 21-22, ¶ 79.)

billing dispute.

## B. **Defendants' Alleged Wrongdoing.**

Plaintiffs allege that Defendants use three "tactics" to turn the NSA's IDR process "into a vehicle for fraud." (Id. at 25, ¶ 94.)  First, "Defendants manipulate the IDR process by strategically submitting massive numbers of open negotiations and IDR initiations—hundreds of which are patently ineligible for IDR—in an attempt to overwhelm the ability of health plans like Anthem to contest claims, confuse and swamp IDREs, and manipulate the IDR process." (Id. at 24, ¶ 93.) The NSA does not impose a numeric limit on IDR claims, but it does have batching rules. (Id. at 53, ¶ 226; Dkt. 76-5 at 22, § 6.1.3.)

Second, "Defendants capitalize on flaws in the IDR process by submitting— and often prevailing with—outrageous payment offers that they could never receive on the open market, including many that exceed the Provider Defendants'[4] own billed charges." (FAC at 24, ¶ 93.) As discussed above, the mandatory IDR process is a baseball-style arbitration where the IDRE must pick the more reasonable number based on certain authorized considerations. (Id. at 20, ¶ 75.)

Third, "Defendants make repeated false statements, representations, and attestations of eligibility to Anthem, the IDREs, and the Departments" via the submission portal. (Id. at 24, ¶ 93.) Plaintiffs allege that between January 2024 and August 2025, Defendants initiated at least 1,500 IDR proceedings against Anthem consisting of more than 2,000 separate services. (Id. at 32-33, ¶ 127.) Plaintiffs "determined that approximately 47 percent of these disputes were ineligible for IDR …." (Id. at 33, ¶ 128.) But in many of those cases, the IDREs found the claim eligibility despite Anthem's evidence, so "Defendants illicitly secured millions of dollars in improper IDR awards." (Id.)  Plaintiffs allege that the IDREs routinely make errors in eligibility determinations because (1) they are

---

[4] The FAC defines "Provider Defendants" to include the LaRoque Family Providers and the Sound Physicians Providers. (FAC at 2.)

only compensated when a dispute reaches a payment determination, and (2) they are overwhelmed by a "staggering volume of disputes" and "cannot complete fulsome reviews [of eligibility evidence] in the timeline provided by the NSA." (Id. at 22, ¶ 80; id. at 28, ¶¶ 105-06.)

The FAC describes the following eleven IDR determinations as examples of outcomes that IDREs wrongly decided because of these tactics:

| No. | | Defendant | Ineligibility Reason |
|---|---|---|---|
| 1 | DISP-918898 | Bruin Neuro-physiology | Plaintiff Anthem Blue Cross Life and Health Insurance Company ("ABCLH") "submitted an objection to eligibility asserting that Bruin had not filed its IDR proceeding within the required time." FAC at 44, ¶ 171. |
| 2 | DISP-1455557 | North American Neurological Associates ("NANA") | "Anthem Payment Disputes, on behalf of ABCLH, submitted an objection to eligibility" stating that NANA "failed to engage in the 30-business day open negotiation period." Id. at 44-45, ¶ 176. |
| 3 | DISP-1455555 | NANA | Same as above. Id. at 45-46, ¶ 181. |
| 4 | DISP-2193991 | N Express | Plaintiff Anthem Blue Cross ("ABC") "submitted an objection to eligibility" stating that the claim was "ineligible for IDR under the NSA because a state surprise billing law applies." Id. at 46-47, ¶ 187. |
| 5 | DISP-2193967 | N Express | Same as above. Id. at 47, ¶ 193. |
| 6 | DISP-945678 | N Express | Same as above. Id. at 48, ¶ 199. |
| 7 | DISP-937342 | iNeurology | ABC told HaloMD that the service was ineligible because it was "a service for which no plan benefits were payable in the first place," but HaloMD still initiated IDR. Id. at 49, ¶¶ 203-05. |
| 8 | DISP-932222 | Sound Physicians Emergency Medicine of Southern California ("SPEMSC") | "The notice of open negotiation attached a spreadsheet with dozens of claims …." Id. at 53, ¶ 226. The claims were for services "rendered to members of self-funded Anthem plans and non-Anthem plans in addition to the services rendered to a member of a fully insured Anthem plan." Id. at 54, ¶ 227. Plaintiffs |

10

| | | | objected to the IDR initiation, stating, "Batched services include multiple Membership types." Id. ¶ 228. |
|---|---|---|---|
| 9 | DISP-1289721 | SPEMSC | ABC "submitted an objection to eligibility" stating that the claim was "ineligible for IDR under the NSA because it involved a Medicare/ Medicaid claim …." Id. at 55, ¶ 234. |
| 10 | DISP-1568233 | SPEMSC | ABCLH "submitted an objection to eligibility" stating that the claim was ineligible for IDR under the NSA because "a state surprise billing law applies." Id. at 56, ¶ 240. |
| 11 | DISP-2639953 | Sound Physicians Anesthesiology of California | ABC "submitted an objection to eligibility" stating that the claim was ineligible for IDR under the NSA because "a state surprise billing law applies." Id. at 57, ¶ 247. |

## III.

## DISCUSSION

**A.**    **Count Eleven: Vacatur.**

     **1.**    **Applicable Law.**

The NSA's provision for baseball-style arbitration requires the IDRE to select one of the party's offers to resolve qualified IDR billing disputes, as follows:

> (5) Payment Determination
>      (A) In general
> Not later than 30 days after the date of selection of the certified IDR entity with respect to a determination for a qualified IDR item or service, the certified IDR entity shall—
> (i)     taking into account the considerations specified in subparagraph (C), select one of the offers submitted under subparagraph (B) to be the amount of payment for such item or service determined under this subsection for purposes of subsection (a)(1) or (b)(1), as applicable; and
> (ii)    notify the provider or facility and the group health plan or health insurance issuer offering group or individual health insurance coverage party to such determination of the offer selected under clause (i).

42 U.S.C. § 300gg111(c)(5)(A).

11

The NSA limits judicial review of IDRE determinations, as follows:

> (E) Effects of determination
> (i) In general
>
> A determination of a certified IDR entity under subparagraph (A) —
>
> (I)    shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and
>
> (II)    **shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9**.

42 U.S.C. § 300gg111(c)(5)(E)(i) (emphasis added).  The reference to "paragraphs (1) through (4) of section 10(a) of title 9" is a reference to the Federal Arbitration Act ("FAA").  Those paragraphs describe the four circumstances under which a district court can vacate an arbitrator's award under the FAA, as follows:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> (1) where the award was procured by corruption, **fraud**, or **undue means**;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where **the arbitrators exceeded their powers**, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4) (emphasis added to identify the grounds for vacatur alleged in the FAC at 85, ¶¶ 357-58).

While the NSA is a recent law, Congress enacted the FAA years ago.  As a result, case law defines what circumstances satisfy subparagraphs (1) and (4).  A party moving for vacatur under § 10(a)(1) must establish: (1) fraud, by clear and convincing evidence, (2) which was not discoverable upon the exercise of due

diligence prior to or during the arbitration, and (3) which was materially related to an issue in the arbitration. Pac. & Arctic Ry. & Navigation Co. v. United Transp. Union, 952 F.2d 1144, 1148 (9th Cir. 1991). "[W]here the fraud or undue means is not only discoverable, but discovered and brought to the attention of the arbitrators, a disappointed party will not be given a second bite at the apple." A.G. Edwards & Sons, Inc. v. McCollough, 967 F.2d 1401, 1404 (9th Cir. 1992).

"Undue means" in the context of § 10(a)(1) refers to conduct that "is immoral if not illegal." Id. at 1403. Vacatur under this provision "requires a showing of bad faith during the arbitration proceedings, such as bribery, undisclosed bias of the arbitrator, or willfully destroying evidence, and further requires that such evidence of fraud was unavailable to the arbitrator during the course of the proceeding." Dandong Shuguang Axel Corp. v. Brilliance Mach. Co., No. C 00-4480 SC, 2001 WL 637446, at *5, 2001 U.S. Dist. LEXIS 7493, at *18 (N.D. Cal. June 1, 2001) (citation omitted). Like fraud, the undue means must be (1) not discoverable upon the exercise of due diligence prior to or during the arbitration, (2) materially related to an issue in the arbitration, and (3) established by clear and convincing evidence. A.G. Edwards, 967 F.2d at 1404.

For vacatur under § 10(a)(4), arbitrators "exceed their powers when they express a 'manifest disregard of law,' or when they issue an award that is 'completely irrational.'" Bosack v. Soward, 586 F.3d 1096, 1104 (9th Cir. 2009) (citation omitted). "For an arbitrator's award to be in manifest disregard of the law, it must be clear from the record that the arbitrator recognized the applicable law and then ignored it." Id. (citation modified). Mere "misinterpretations of the law" do not justify vacatur. French v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 784 F.2d 902, 906 (9th Cir. 1986).

Sometimes an arbitration agreement delegates the issue of arbitrability to the arbitrator. When that happens, "the arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the

13

merits." See Schoenduve Corp. v. Lucent Techs., Inc., 442 F.3d 727, 733 (9th Cir. 2006).

### 2. Relevant Allegations.

Plaintiffs seek "vacatur of individual IDR determinations under 42 U.S.C. § 300gg-111(c)(5)(E)" because "[e]ach individual IDR determination at issue" was procured by fraud and undue means in the form of false eligibility attestations, and "the IDREs exceeded their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process." (FAC at 85, ¶¶ 356-58.) Plaintiffs do not list all the IDR determinations they seek to vacate, but they allege that "the list of IDR payment determinations subject to vacatur is expected to increase during the pendency of the case." (Id. ¶ 359.) Plaintiffs pray for "vacatur of the underlying IDR determinations." (Id. at 88 (prayer for relief).)

### 3. Analysis.

Plaintiffs argue, "Anthem is seeking judicial review of Defendants' NSA Schemes, and not any individual IDRE payment determination." (Dkt. 93 at 48.) But Plaintiffs' claim for vacatur, while pled in the alternative, seeks to vacate "each individual IDR determination at issue." (FAC at 85, ¶ 356.) Plaintiffs' other fraud-based claims, like RICO, could not be litigated without deciding whether Defendants made false eligibility attestations, a decision that would necessarily re-examine eligibility determinations made by IDREs.

#### a. Fraud.

First, Plaintiffs urge the Court not to follow the above-cited Ninth Circuit cases and instead look to Eleventh Circuit cases. (Dkt. 93 at 49.) But Ninth Circuit cases are binding on this district court.

Next, Plaintiffs argue that the requirements discussed in Pacific & Artic Railway and A.G. Edwards cannot be fairly applied to the NSA IDR process because the Ninth Circuit test "presumes the existence of an opportunity to litigate

the alleged fraud" before the arbitrator. (Id.)  Plaintiffs did not allege facts showing that Anthem cannot litigate eligibility within the IDR process.  Indeed, the FAC's allegations show that participants in the IDR process can tell the IDRE if they believe a dispute is ineligible and why.  (FAC at 30, ¶¶ 115, 118 (describing how Anthem objects to unqualified items).)  "The baseball-style dispute resolution process … is premised on the notion that ineligible claims will be weeded out at the outset."  (Id. at 30, ¶ 113; see also Dkt. 76-5 at 18, § 5.5 ("If the non-initiating party believes that the Federal IDR Process is not applicable, the non-initiating party must notify the Departments by submitting the relevant information through the Federal IDR portal as part of the certified IDR entity selection process.").

Plaintiffs objected to eligibility for all the sample determinations identified in the FAC and summarized in the chart on pages 10 to 11, above.  IDREs are instructed that they "must determine whether the Federal IDR Process is applicable."  (Dkt. 76-5 at 18, § 5.5.)  IDREs can, and sometimes do, determine that a billing dispute is not eligible.  (FAC at 30, ¶ 115 (alleging that most, but not all, of "Defendants' ineligible disputes reach a payment determination" despite "Anthem's objections").)

Plaintiffs point to procedural rules for arbitration in other forums, such as rules providing for in-person hearings, cross-examination, and written decisions explaining the arbitrator's reasoning.  (Dkt. 93 at 49.)  But such procedures are not necessary to bring allegedly fraudulent eligibility attestations to an IDRE's attention.  If the Court were to adopt Plaintiffs' position, then nearly every eligibility determination disputed by an IDR participant would be subject to review in federal court.  That would be inconsistent with the NSA's creation of a streamlined IDR process for resolving surprise billing disputes and its limitations on judicial review.

As aptly put by the Sound Physicians Providers, by alleging that Plaintiffs knew about the false eligibility attestations and objected, "Anthem has pleaded itself out of court," at least as to vacatur based on fraud, because the "fraud" was

known during the IDR and disclosed to the IDRE.  (Dkt. 69-1 at 22.)  As a result, the FAC's allegations, even if accepted as true, do not establish the kind of "fraud" that justifies vacatur under § 10(a)(1).  Plaintiffs have not identified even one example of an IDR determination for which they could amend and allege that a Defendant made a false eligibility attestation based on facts that Plaintiffs did not know, and could not reasonably have known, before or during the IDR process.

b.    Undue Means.

Plaintiffs argue that the IDREs are "financially incentivized" to disregard objections to eligibility.  (Dkt. 93 at 50.)  The FAC describes how IDREs only receive fees if they find a dispute eligible.  (FAC at 22, ¶ 80; id. at 30, ¶ 116.)  But this fee structure is part of the IDR rules established by Congress.  See 42 U.S.C. § 300gg-111(c)(5)(F).  Such financial incentives are not akin to bad faith or bribery.  In any event, the FAC does not allege that improper financial incentives motivated an IDRE's decision-making for any particular award.  Plaintiffs have not suggested that they could amend and add such facts.

c.    Excess of Authority.

Plaintiffs argue that they are "entitled to judicial review where, as here, the IDREs 'exceeded their powers' by issuing payment determinations on disputes that were ineligible for IDR."  (Dkt. 93 at 48.)  The FAC alleges that IDREs issued hundreds of payment determinations for services that were not a qualified IDR item or service.  (FAC at 33, ¶ 128 (referring to 47% of 1,500 IDR proceedings).)

The IDREs, however, are authorized to decide eligibility.  "First, the IDRE is directed by regulation (though not by the Act itself) to 'determine whether the Federal IDR process applies.'  45 C.F.R. § 149.510(c)(1)(v)."  (Id. at 20, ¶ 73.)  It makes no difference whether the directive to first determine eligibility is in the NSA's text or the implementing regulations.

The moving parties cite Reach Air Med. Servs. LLC v. Kaiser Found. Health Plan Inc., 160 F.4th 1110, 1114 (11th Cir. 2025).  In that case, a medical service

16

provider (an air ambulance) challenged an IDR award in which the IDRE chose Kaiser's number. Reach Air, 160 F.4th at 1114-15. The air ambulance company sued to vacate the award under § 10(a)(4), alleging that the IDRE exceeded its authority "by applying an illegal presumption in favor of Kaiser." Id. at 1119. The Eleventh Circuit noted, "An arbitrator's actual reasoning is of such little importance to our review that it need not be explained …. Our sole question under § 10(a)(4) is whether the arbitrator (even arguably) performed the assigned task, not whether she got the outcome right or wrong." Id. at 1120 (citation modified). The examples given included "awarding relief on a statutory claim when the arbitration agreement allows only for arbitration of contractual claims" or "failing to give preclusive effect to an issue previously decided by a court." Id.

Here, Plaintiffs argue that IDREs have issued awards for ineligible claims and thus strayed from their "assigned task." (Dkt. 93 at 48 n.11.) But movants counter that part of the IDREs' assigned task is to decide eligibility. (Dkt. 117 at 19.) Plaintiffs do not (and cannot) allege that IDREs failed to rule in Anthem's favor in the complete absence of factual support for eligibility, because Plaintiffs allege that Defendants consistently represent (albeit falsely) to the IDREs that the claims are eligible. (FAC at 3, ¶ 3; id. at 23, ¶ 90.) Such allegations collapse the analysis under § 10(a)(4) into the same test as § 10(a)(1). Plaintiffs raised Defendants' allegedly false eligibility attestations to the IDREs, and the IDREs were authorized to determine eligibility. This means that judicial review of the IDREs' eligibility determinations premised on the same allegedly false eligibility attestations is not available. Pac. & Arctic Ry., 952 F.2d at 1148.

Because Plaintiffs' allegations do not meet the substantive requirements for claiming vacatur under 9 U.S.C. § 10(a)(1) or (4), the Court need not decide whether any of the FAA's procedural requirements for seeking vacatur (like timing and

venue) apply to claims seeking vacatur of NSA IDRE determinations.[5]

**B. Subject Matter Jurisdiction over Remaining Federal Counts (1-4, 12, 13).**

Movants argue that the NSA's above-discussed limitations on judicial review bar the Court from exercising subject matter jurisdiction over Plaintiffs' other federal claims, because those claims seek review of IDRE determinations, regardless of the legal label.  (Dkt. 69-1 at 26.)  None of Plaintiffs' responses to this argument (discussed below) are persuasive.

**1.    The Statutory Interpretation Argument.**

In a novel argument unsupported by any case law, Plaintiffs contend that the NSA's limitations on judicial review apply only to "[a] determination of a certified IDR entity *under subparagraph (A)*," and subparagraph (A) refers only to payment determinations, not eligibility determinations.  (Dkt. 93 at 43 (emphasis added).)  But as set forth in full above, subparagraph (A) refers to "a determination for a qualified IDR item or service."  42 U.S.C. § 300gg111(c)(5)(A).  An IDRE's payment determination necessarily includes a determination of eligibility.  Plaintiffs' proposed reading of 42 U.S.C. § 300gg111(c)(5)(E)(i), which would impose *no* limits on judicial review of IDREs' eligibility determinations, would be clearly contrary to the streamlined dispute resolution process that Congress intended when it created the NSA's IDR process.

**2.    The Policy Argument.**

Next, Plaintiffs urge the Court not to apply the NSA's limits on judicial review because the IDR process is deeply flawed and there is no readily available remedy for erroneous IDR awards.  (Dkt. 93 at 23-27.)  But such policy-based arguments would be better directed at Congress which alone has the power to

---

[5] Count Eleven also fails because the alleged fraud is not pled with specificity as to every challenged IDR determination, as required by Federal Rule of Civil Procedure 9(b).  This order does not rely on Rule 9(b), because non-compliance with Rule 9(b) could potentially be cured by amendment.

rewrite the NSA.  Moreover, the FAC alleges that false attestations to the federal government can violate 18 U.S.C. § 1001, providing a strong incentive against making false attestations.  (FAC at 18-19, ¶ 67.)

### 3. The "Outside the Scope" Argument.

Next, Plaintiffs argue that the NSA's limits on judicial review apply only to claims seeking to vacate IDR awards, but Plaintiffs' claims for monetary damages for time spent addressing fraudulent submissions and for prospective injunctive relief can be adjudicated without reviewing any IDR awards.  (Dkt. 93 at 51-52.)  Therefore, Plaintiffs argue that their claims fall outside the scope of the NSA's jurisdiction-stripping provisions.  (Id.)

Plaintiffs' federal claims cannot be adjudicated without reviewing the correctness of past IDR awards or inserting the district court in overseeing future IDR awards.  The district court could not, for example, award damages measured by time spent addressing a fraudulent eligibility attestation without first deciding that the eligibility attestation was false.  Similarly, the district court could not order Defendants to pay damages measured by IDR administrative fees for disputes ineligible for the IDR process without first deciding that the dispute was ineligible for IDR.  And if, for example, the district court entered a follow-the-law injunction that prohibited Defendants from making future false eligibility attestations, then Plaintiffs would be able to come back into court to request a contempt remedy for violations of such an injunction, a remedy that would require litigating whether the challenged attestation was false.  These theories are all end runs around the NSA's limits on judicial review.

### 4. The "Other Statutory Basis" Argument.

Plaintiffs argue that jurisdiction to hear its federal claims is conferred by ERISA or the federal Declaratory Judgment Act.  (Dkt. 93 at 84.)  These laws generally provide that district courts can hear certain kinds of claims, but neither specifically allows claims that require judicial review of IDR awards, as Plaintiffs'

federal claims do.  These federal laws' general jurisdictional language does not supplant the NSA's specific limitations on judicial review.

**C. Supplemental Jurisdiction over Counts 5-10.**

The Court has discretion to exercise supplemental jurisdiction over state law claims that do not, themselves, have a basis for federal subject matter jurisdiction once the Court has dismissed the claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  Here, Plaintiffs' federal claims all fail for the reasons stated above.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.

**D. The Anti-SLAPP Motions.**

"California law provides for the pre-trial dismissal of certain actions, known as Strategic Lawsuits Against Public Participation, or SLAPPs, that masquerade as ordinary lawsuits but are intended to deter ordinary people from exercising their political or legal rights or to punish them for doing so."  Planet Aid, Inc. v. Reveal, 44 F.4th 918, 923 (9th Cir. 2022) (quoting Makaeff v. Trump Univ., LLC, 715 F.3d 254, 261 (9th Cir. 2013)); see Cal. Civ. Proc. Code § 425.16.  The Ninth Circuit has held that California Code of Civil Procedure section 425.16 is, in part, a substantive law that applies in federal court to state law claims.  See United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 972-73 (9th Cir. 1999).

To prevail on an anti-SLAPP motion, "the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech."  Makaeff, 715 F.3d at 261.  "Once it is determined that an act in furtherance of protected expression is being challenged, the plaintiff must show a 'reasonable probability' of prevailing in its claims for those claims to survive dismissal."  Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 840 (9th Cir. 2001) (citation omitted); see also Makaeff, 715 F.3d at 261.  Under this standard, "the claim should be dismissed if the plaintiff presents

an insufficient legal basis for it, or if, on the basis of the facts shown by the plaintiff, 'no reasonable jury could find for the plaintiff.'" Makaeff, 715 F.3d at 261 (quoting Metabolife, 264 F.3d at 840).

Here, movants argue (primarily) that all of Plaintiffs' state law claims (1) arise from petitioning activity protected by the First Amendment and (2) are unlikely to succeed because the same limitations on judicial review that deprive the Court of jurisdiction over Plaintiffs' federal claims apply equally to Plaintiffs' state law claims. (Dkt. 68, 78.)

The Court has already dismissed the state law claims, exercising its discretion under 28 U.S.C. § 1367(c)(3) not to assert supplemental jurisdiction. Without any state law claims, district courts may properly decline to address anti-SLAPP motions. See Hilton v. Hallmark Cards, 599 F.3d 894, 901 (9th Cir. 2010) ("[A] federal court can only entertain anti-SLAPP special motions to strike in connection with state law claims ...."); McMillan v. Chaker, 791 F. App'x 666, 667 (9th Cir. 2020) (holding that the district court, after dismissing all federal claims, did not abuse its discretion in not exercising supplemental jurisdiction over the remaining state law claims and not addressing the anti-SLAPP motion).

Movants urge the Court to retain jurisdiction to rule on the anti-SLAPP motions. The Court declines to do so. Applying California's anti-SLAPP law requires analysis under the two-part test described above, which goes beyond the analysis needed to dismiss the federal claims. Furthermore, Plaintiffs ask the Court to consider (1) a new Supreme Court decision that Plaintiffs believe limits or eliminates anti-SLAPP motions in federal court, and (2) the timing of the motions, both issues the Court need not reach if it declines to retain jurisdiction. (Dkt. 92 at 13-14, 23.) Finally, the Court has inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). Declining to address the anti-SLAPP motions serves the interest of judicial economy.

**E. Leave to Amend.**

If a district court finds that a complaint should be dismissed for failure to state a claim, the court has discretion to dismiss with or without leave to amend. Lopez v. Smith, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc). The court may dismiss a complaint without leave to amend if further amendment would be futile. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 339 (9th Cir. 1996). If, after careful consideration, it is clear that a complaint cannot be cured by amendment, then the district court may dismiss without leave to amend. See, e.g., Chaset v. Fleer/Skybox Int'l, 300 F.3d 1083, 1088 (9th Cir. 2002) (holding that "there is no need to prolong the litigation by permitting further amendment" where the "basic flaw" in the pleading cannot be cured by amendment).

Plaintiffs request leave to amend. (Dkt. 93 at 87.) But in neither briefing nor oral argument have Plaintiffs identified any facts that they could add that would (1) qualify a particular IDE determination for vacatur or (2) put its other federal claims beyond the jurisdiction-stripping provisions of 42 U.S.C. § 300gg111(c)(5)(E)(i)(II). Since leave to amend would be futile, the Court declines to grant leave to amend.

**V.**

**CONCLUSION**

Based on the foregoing, **IT IS ORDERED** that (1) the motions to dismiss (Dkt. 69, 73, 76, 77) shall be granted for the reasons stated above; (2) all other pending motions (Dkt. 68, 72, 74, 78) shall be denied as moot; and (3) the FAC shall be dismissed in its entirety, without leave to amend.

DATED: April 9, 2026

_____
KAREN E. SCOTT
United States Magistrate Judge